Will J. BENNETT et al., Appellants,

v.

CITY OF MAYFIELD, Ky., et al.,
Appellees.

Court of Appeals of Kentucky.

April 17, 1959.

Roy A. Roberts, Mayfield, for appellants.

Sam Boyd Neely, Mayfield, Skaggs, Hays & Fahey, Louisville, F. W. Knowlton and Joseph M. Leyden, Akron, Ohio, for appellees.

STANLEY, Commissioner.

In order to relieve conditions of unemployment, the City of Mayfield is proposing to issue $9,500,000 of revenue bonds for the acquisition of a site and construction of an industrial plant and to lease the same under authority of KRS 103.200–103.280. The council has adopted appropriate preliminary ordinances and approved a form of contract of lease and rent of the property to the General Tire and Rubber Company of Akron, Ohio, a nationally known company of high reputation. This representative taxpayer's suit challenging the legality of the proposed action of the city raises several substantial questions.

The court found from evidence that conditions of unemployment of workmen in the City of Mayfield, present and in the foreseeable future, justify the venture as a proper public purpose within the corporate power of the City of Mayfield granted by the statute and the principles laid down in Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80. It is contemplated that the proposed industry will afford employment to 500 people, and that in the near future the lessee may expand its local facilities so as to employ twice that many. The plan and proceedings closely follow those described in the Danville opinion ex-

cept that here there is an additional provision granting an option to the lessee to purchase the property.

As of possible anticipatory failures of the plan to relieve unemployment, the appellant points out that there is no contractual commitment that the building will be uninterruptedly and. at all times operated in a way that will employ a substantial number of people, and that the building might be destroyed by fire with the result that many people would be thrown out of work. The contract of lease and rent states that the lessee "intends" to use the building for the purpose described during the entire period. This is the provision of KRS 103.200. The statute does not require more. The proposed contract further provides that whenever the building is used, it will be for a factory or some purpose as set forth in the statute. The contract provides that should the building be destroyed by fire or other casualty or be taken by condemnation, the lessee does not have to continue to operate the lease.

■ These and like possibilities of failure of the undertaking are present in every venture which looks to the future. Such constitute reasonable and calculated risks of business. It is to be remembered we are dealing here with a proprietary venture on the part of the city which has been sanctioned by the Legislature. Incidents of municipal proprietary functions should not be hampered by too stringent judicial construction or review. A more liberal regard may be had for contingencies or possibilities than where a city and its taxpayers may suffer some financial loss. At any rate, we may observe analogously that no machine will work if its bearings are too tight.

■ The industry will be located near but outside the city limits. A question is raised as to the authority of a municipality to engage in such a venture under that condition. The industry in the Danville case was also outside the city limits, and while not discussed, it is implicit in the opinion

that the court regarded the action as not ultra vires. The subject of power of a city to own and use property located beyond its corporate limits was considered with some elaboration in Smith v. City of Kuttawa, 222 Ky. 569, 1 S.W.2d 979. We held that there was no legal reason why a municipality may not acquire and hold property so located for useful and legitimate city purposes.

The proposed contract of lease and rent contains the provision that "as a part of the consideration for the company" entering into the contract, the city grants it an option to renew the lease for an additional period on the expiration of the original twenty year term. It further provides:

"As an alternative to the provisions contained in this paragraph with regard to the option for a renewal of the lease the Company is hereby granted the additional option to purchase from the City the fee simple title of the land and building together with the machinery and equipment located therein covered by this lease agreement, on January 1, 1969, or on any subsequent January 1 during the original term or any extension thereof of this lease upon six (6) months' notice to the City. Such option to purchase may be exercised by payment to the City of a sum based on the cost to the City of the land and buildings and the machinery and equipment as evidenced by its Industrial Building Revenue Bonds, less the following dollar amounts:"

The amounts payable vary according to the remaining amount of outstanding bonds at the time the option is exercised and such further sum as may be sufficient to pay in full or accomplish the retirement of the bonds.

The proposed contract also contains this statement:

"The City recognizes that the exercise by the Company of the option to purchase would be to the advantage of the City as the leased premises could then be placed on the tax rolls, and the purpose for which the Project was undertaken by the City, namely providing for industrial employment to maintain a sound and proper balance between agriculture, commerce and industry and between male and female factory workers would still be accomplished."

The appellant submits that the option to purchase the property in consideration of paying all outstanding bonds (1) is, in effect, the lending of the city's credit in violation of § 179 of the Constitution which prohibits the General Assembly from authorizing a city "to loan its credit to, any corporation" etc.; (2) is in conflict with the law which requires municipalities when selling any property to advertise for bids and accept the highest and best bid; and (3) is unauthorized since the provision is not within the meaning of KRS 103.230, which declares that the bonds shall be payable solely by revenue derived from the building.

The question of the validity of the option provision is not hypothetical because it may never be exercised. The provision is of the essence of the contract and the entire scheme. The option is stipulated to be a moving consideration, and it is doubtful if the proposed plan and project would be agreed to or accomplished without it. Therefore, the court now decides the question.

(1) The option provision in the present plan injects a new feature. In other cases of this class it appears title to the property remained in the city and became free of the lien whenever the bonds became fully paid. It will be otherwise in this case if the lessee elects to exercise the option. The city will then have nothing tangible. But it started out on the venture with nothing. Meanwhile, the city will have had the benefits arising from a large local enterprise and the community will in the future have that, plus the taxes on the property.

■ Although the question was not expressly considered in the Danville and our other cases of this class, the conclusion that there was no lending of credit within the meaning of the constitutional bar is implicit in the decisions. Must it be said that the inclusion of an option to purchase the property and terminate the lease makes any difference? There may be a distinction where payment of bonds is a direct obligation of a municipality,[1] but in the present plan the city acts only as a trustee with special powers and duties which do not involve the assumption of a money obligation. As is held generally, and by this court specifically, revenue bonds of this character are not regarded as creating an indebtedness of the municipality within the meaning of the debt limit provisions of the Constitution. Upon the same reasoning, the transaction may be held not to constitute a lending of credit.

The State of Tennessee has a statute similar to KRS 103.230 et seq., for the encouragement or promotion of industrial enterprises carried on by private ownership. The Supreme Court of that state has held the scheme does not authorize the expenditure of public funds for private purposes nor extend the credit of the political subdivision contrary to the Tennessee Constitution. Holly v. City of Elizabethton, 193 Tenn. 46, 241 S.W.2d 1001; Darnell v. County of Montgomery, Tenn., 308 S.W.2d 373. In the second case cited the contract granted an option to the lessee to purchase the property at any time within the last ten years of the term of the lease. The court found that this was not material to the validity of the contract and upheld it. This court herein so holds.

■■ (2) With respect to the power of a city to dispose of its property without advertising for bids, there is a clear distinction between disposing of property purchased and held for public use and the benefit of the citizens and disposing of property acquired and used for strictly corporate or proprietary purposes. As to the latter class of property, the power of a municipality to sell is unquestionable unless restrained by charter or statute. That is the law in general. Southeastern Greyhound Lines v. City of Lexington, 299 Ky. 510, 186 S.W.2d 201. We held in that case the City was authorized to sell and convey property which had not been dedicated to public use to a company for the purpose of erecting a bus terminal. There are many special transactions of such character as to make it impractical or unwise to apply the policy of competitive bidding, such, for example, as buying a particular property by contract or acquiring it by condemnation or contracting for professional services. The commitment of the City of Mayfield to sell and convey the property to the lessee according to the option is not an obligation to sell property in the ordinary and usual meaning or such a character of sale as generally requires competitive bids. This commitment is an integral and essential consideration of the whole contract, existing ab initio, and is not a contract arising subsequent to the lease. The contention here made by the appellant was made in Darnell v. County of Montgomery, supra, Tenn., 308 S.W.2d 373, and not sustained. We, therefore, hold this provision not to be such a contract of alienation or sale of property as requires advertisement and sale on competitive bids.

(3) The statute, KRS 103.230, contains the statement that, "The bonds shall be payable solely from the revenue derived from the building." The appellant submits there is no authority for the payment of the

---

1. See Dyche v. City of London, Ky., 288 S.W.2d 648, holding that issuance of tax bonds, voted by the people, for the erection of a building and leasing it to an industry for the relief of unemployment is for a public purpose and does not constitute a loaning of the city's credit in violation of § 179 of the Constitution. There was no obligation of the city to convey or option of the lessee to acquire full title to the property upon payment of the unmatured bonds, as in the present case. See 38 Am.Jur., Municipal Corporations, § 402.

bonds from the proceeds of a sale of the property. We think a construction of the statutory provision as meaning that the bonds may not be paid from other funds derived from the project and the property is too restrictive. The quoted clause is followed by the statement, "and shall not constitute an indebtedness of the city within the meaning of the Constitution." It seems apparent that the statement was intended to make certain that bond holders have no claim on funds raised or to be raised by taxation.

 Ordinarily, the word "revenue" is regarded as meaning income, but the meaning is more comprehensive. Webster defines the word to mean also "a source of income" and "that which returns or comes back." The Supreme Court long ago held that "revenue" includes the proceeds of the sale of public securities and lands. United States v. Norton, 91 U.S. 566, 23 L.Ed. 454. In Protest of Reid, 160 Okl. 3, 15 P.2d 995, it was held that when a municipal utility was sold, the proceeds of the sale constituted "revenue" which must be applied to purposes for which the money was borrowed, and that included the retirement of unmatured bonds which were issued for the purpose of constructing the utility. Moreover, although our statute is silent as to insuring the property covered by the bonds, common business prudence justifies the agreement that the lessee of the property will keep the buildings fully insured against loss or damage by fire or other hazards and that any proceeds from the insurance not used in repair or reconstruction must be applied to the payment of outstanding bonds. In the present case the ordinance providing for the issuance of the bonds contains the provision that the bonds shall be subject to redemption prior to maturity, and the face of the bonds will show that fact. See KRS 103.220(2). These are usual and common provisions, and it has never been nor could it reasonably be contended that the satisfaction of bonds out of insurance proceeds was not payment "from the revenue derived from the building." By a parity of reasoning it is logical and reasonable to say that there is no prohibition against applying proceeds of sale of the property to the satisfaction of outstanding bonds. We hold that as being the proper interpretation of the statute concerning payment of the bonds in this case.

The judgment is affirmed.