Edna V. UHLS, City Clerk, City of Cheyenne, Appellant (Defendant below),

v.

STATE of Wyoming ex rel. CITY OF CHEYENNE, Appellee (Plaintiff below).

No. 3589.

Supreme Court of Wyoming.

June 12, 1967.

Paul B. Godfrey, Thomas O. Miller, Ellen Crowley, Cheyenne, for appellant.

Brooke Wunnicke, Cheyenne, for appellee.

Before GRAY, McINTYRE, and PARKER, JJ., and SPANGLER, D. J.

Mr. Justice McINTYRE delivered the opinion of the court.

This is an action to determine the validity of Cheyenne's proposed financing of the $25,000,000 Frontier Refining Project and the constitutionality of the act for industrial development projects, art. 8, ch. 112, S.L. of Wyoming 1965 (§§ 15.1–92—15.1–100, W.S.1957, Compiled 1965). To secure such determination, the state on the relation of the City of Cheyenne brought a mandamus action in the district court against the city clerk, seeking to compel execution of the Asset Purchase Agreement for acquisition of the Frontier Refining Project. In so doing, plaintiff sought a declaration of validity and constitutionality as to: (a) the mentioned act; (b) the Cheyenne ordinances, seeking under the act to authorize the Frontier Refining Project and to finance it by revenue bond sale; (c) the purchase agreement, the lease, and the mortgage; (d) the violation of art. 16, §§ 4, 5, 6, and art. 13, § 3, Wyoming Constitution, by the financing.

Defendant's answer specifically denied the validity and constitutionality of the laws and instruments under which consummation of the project was undertaken and raised other defenses, including additional constitutional challenges.

There was no actual trial but after certain stipulations and interrogatories had been entered and a deposition taken, the court, apparently acting pro forma, entered special findings of fact, reciting generally that under an ordinance passed by the City it proposed to issue revenue bonds for the purpose of acquiring the Frontier Refining Project (which would promote the economic welfare of Cheyenne by increasing employment, stimulating industrial activity, augmenting sources of tax revenues, fostering economic stability, and improving the balance in the City's economy), the land,

buildings, machinery, etc., then owned and operated by the refining company, being suitable for the project; that the proceeds from the bond sale would be deposited with the trustee, who would disburse the proceeds as directed by the City under the provisions of the indenture and lease agreement; that the total acquisition figure would be $23,189,495, plus an amount sufficient to defray all expenses in connection with the authorization, sale and issuance of the bonds in the sum of $18,689,495, being the amount to be paid the refining company initially and $4,500,000 to be expended for modernization and expansion of the project, essential to the refinery's continued operation; that the modernization and expansion of the refinery will result in the hiring of additional employees; and that Frontier is the only oil refinery in the City of Cheyenne; that the City would be the owner of a project suitable for operation as a manufacturing or industrial project and lease it to the Frontier Refining Company; that the purchase agreement covered certain realty, personal property, and leaseholds now held by the refinery company; that by the lease agreement that company was to pay rental revenues sufficient to cover all payments of principal and interest on the revenue bonds, all costs, fees, expenses, and premiums incident to the issuance, administration and prior redemption or payment of the revenue bonds, and all taxes, special assessments, insurance, utilities repairs, maintenance and ground rents of the project; and that the indenture of mortgage and deed of trust provided for the establishment of four separate accounts with the trustee, the project acquisition account, the Frontier Project bond principal and interest fund, the Frontier Project administration fund and maintenance fund, and that additional series of bonds might be issued subject to prescribed earnings limitations.

From the pleadings, stipulations, and its findings of fact, the court made various conclusions of law, which in summary may

be said to have been a holding that all of the steps taken by the City of Cheyenne, Boettcher and Company (who proposes to underwrite the bonds), and the Frontier Refining Company in the consummation of the proposed financing project, had been legal and proper, subject to five constitutional questions which were reserved and sent to this court for answer:

"1. Do the provisions of Chapter 1, Art. 8 of ch. 112, S.L. of Wyoming, 1965 and plaintiff's Ordinances Nos. 1535 and 1538, including the Asset Purchase Agreement, Lease Agreement, and Indenture of Mortgage and Deed of Trust authorized by Ordinance No. 1538, contain delegations of power in contravention of Art. 1, § 7 and Art. 3, § 37, Wyo.Const.?

"2. Is the industrial revenue bond financing authorized by Chapter 1, Art. 8 of ch. 112, S.L. of Wyoming, 1965 and by plaintiff's Ordinances Nos. 1535 and 1538 for a public purpose as required by Art. 13, § 3, Wyo.Const.?

"3. Does the industrial revenue bond financing authorized by Chapter 1, Art. 8 of ch. 112, S.L. of Wyoming, 1965 and by plaintiff's Ordinances Nos. 1535 and 1538 constitute the lending of public credit for a private purpose in contravention of Art. 16, § 6, Wyo.Const.?

"4. Does the industrial revenue bond financing authorized by Chapter 1, Art. 8 of ch. 112, S.L. of Wyoming, 1965 and by plaintiff's Ordinances Nos. 1535 and 1538 contravene the municipal debt limitations prescribed by Art. 16, § 4 and § 5, Wyo. Const.?"

"5. Does the industrial revenue bond financing authorized by Chapter 1, Art. 8 of ch. 112, S.L. of Wyoming, 1965 and by plaintiff's Ordinances Nos. 1535 and 1538, by providing for taxation of the project property contravene Art. 15, § 12 Wyo. Const., which exempts municipal property from taxation?"

The defendant appealed from that portion of the findings of fact which held the proposed project would promote the economic welfare of Cheyenne and its residents and from the mentioned conclusions of law.

*Question No. 3*

Since neither this case nor its companion, Reed v. City of Cheyenne, Wyo., 429 P.2d 69, can be completely and fully disposed of without resort to the constitutional questions presented, we turn immediately to them. In so doing we are impressed with the significance of Question 3, dealing with a suggested violation of art. 16, § 6, Wyoming Constitution, which provides that "Neither the state nor any county, city, township, town, school district, or any other political sub-division, shall loan or give its credit or make donations to or in aid of any individual, association or corporation".[1]

The concept by which government should assist private industrial development is by no means new, having once flourished in the railroad bond era of the nineteenth century and been later revived with the Mississippi "Balance Agriculture with Industry" plan of 1936, from which time the idea has spread throughout the country until in 1965 some form or other of it has been adopted in twenty-three states.[2] The Mississippi Act declared the development to be a matter of public policy, provided (1) for a commission to effectuate such policy by investigation and action and (2) for a vote of the people in the community to be affected. In Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436, appeal dismissed 303 U.S. 627, 58 S.Ct. 766, 82 L.Ed. 1088, a case which has been since

---

1. Although the submitted question asks if the financing constitutes "the lending of public credit for private purpose" in contravention of the section, no direct reference is made in the constitutional provision to "private purpose," and we take the question to relate to the loan of credit "to or in aid of any individual, association or corporation."

2. Informative background discussions are found in 19 Vand.L.Rev. 25; 18 Maine L. Rev. 1 and 25; 111 U. of P.L.Rev. 265; 15 U.Fla.L.Rev. 264.

spotlighted both by criticism and approval, the court held the legislation to be constitutional, emphasizing the right of the legislature to declare a public purpose, especially when it provided the means for effectuating it and distinguishing the situation where the city owned and had control of the property from one wherein there was a lease. The propriety and legality, including constitutionality, of a specific scheme does not lend itself to any easy "yes or no" answer. This is true first because of the inevitable variance in the constitutional background of each state and the usual difference in either the plan for the proposed development or the statute which is adopted to effectuate it. As a result of the incongruities, there are not many true analogies extant, and although collation is necessary in the consideration of any case such as the one now before us, it is less than conclusive or even satisfactory in many instances. Historically, the validity of bond arrangements for industrial development projects has varied also in the different jurisdictions because of fundamental dissimilar, basic concepts of the judicial personnel who consider the cases; certain judges interpret controlling constitutional provisions strictly or literally while others are more liberal or indulge in sophistic reasoning, some appearing to be influenced by pragmatic considerations. Illustration of the often ambiguous or ambivalent results will be apparent from our examination of cases, which have dealt more or less directly with the elementary question here: Is financing of this type of project violative of constitutional provisions providing that a city shall not loan or give its credit or make donations to or in aid of any corporation?

Although not directly in point, a corollary problem arose in Ohio where a statute authorizing an agency of the state to issue revenue bonds with the proceeds to be loaned to industries located in the state was held unconstitutional as a lending of the state's credit. State ex rel. Saxbe v. Brand, 176 Ohio St. 44, 197 N.E.2d 328. In Florida, although the legislature has not enacted a statute authorizing industrial development bonds, a number of communities have sought to accomplish financing not unlike that espoused here and the court has consistently rejected any such plan as unconstitutional on the ground, among others, that this would violate the prohibition against lending of credit, e. g., State v. Town of North Miami, Fla., 59 So.2d 779.

Of the states coming to our attention wherein there has been some legislation authorizing financing more or less of the type sought here, we find eight states in which constitutional provisions are so dissimilar to ours as not to merit discussion: Delaware, Kansas, Maryland, North Dakota, South Dakota, Tennessee, Vermont, and West Virginia. In one state, Georgia, provisions of local constitutional amendments have been applied to matters arising in that jurisdiction, which differentiate them from the matter here. In four states, constitutional amendments have been passed which should remove any possible challenge of a statute's permitting industrial development projects by municipalities. They are: Arkansas, Missouri, Maine, and Nebraska. There seems no occasion to discuss any of these except Nebraska where a statute almost identical to Wyoming's was passed and found to be unconstitutional by the supreme court and where a *subsequent* constitutional amendment excepted industrial revenue bonds from the lending-of-credit restriction. Further allusion will later be made to the Nebraska situation.

Although the Oklahoma constitution prohibits municipalities from loaning credit, it permits the state to engage in any occupation or business for public purposes. In Harrison v. Claybrook, Okl., 372 P.2d 602, 605, industrial revenue bonds had been issued by means of an Authority, for which provisions were made in their Local Industrial Development Act; and the court, noting that the Authority was in the general category of a governmental agency or public corporation, with limited powers, for the purpose of conducting a state function, held

the applicable constitutional provisions did not render the Authority or its trust instrument invalid.

In two states, Illinois and Mississippi, we find no cases on their present statutes.

Five states, which have a constitutional provision proscribing a municipality's lending of credit, have determined as not unconstitutional a statutory provision more or less similar to that in Wyoming. The situation in each of these jurisdictions requires consideration here.

In Alabama it was held in 1952 that since a project was to be financed solely from the proceeds of revenue bonds § 94 of their constitution forbidding the lending of credit by a municipality did not apply. Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629. Numerous cases are cited as supporting the announced principle. A review of these cases and their predecessors indicates that this concept emanated in that court in the nineteenth century, Garland v. Board of Revenue of Montgomery County, 87 Ala. 233, 6 So. 402, and has been echoed since that time.

In Iowa, the case of Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5, is relied upon heavily by the proponent of the project here. Examination discloses, however, that the constitutional provision there in issue prohibiting the State from loaning its credit does not relate specifically to the city so that any holding in that jurisdiction may not be directly in point. Additionally, the court in the cited case said that the city assumed neither primary nor secondary liability and quoted as self-explanatory the case of Grout v. Kendall, 195 Iowa 467, 192 N.W. 529, 531:

" 'What is meant herein by a loan of credit? * * * This particular section of our Constitution was taken bodily from the Constitution of New York. As a part of the Constitution of New York, it was the result of past experience in the history not only of New York, but of other states as well, whereby aspiring new states had loaned their credit freely and extravagantly to corporate enterprises

which had in them much seductive promise of public good. These enterprises included railways, canals, water powers, etc. The corporate body in each case was the primary debtor; the state became the underwriter; it loaned its credit always with the assurance and belief that the primary debtor would pay. Pursuant to these secondary liabilities, the state became overwhelmed with millions of dollars of indebtedness which never would have been undertaken as a primary indebtedness, and which never would have been permitted by public sentiment, if it had been known or believed that the secondary liability would become a primary one through the universal failure of the primary debtor. The ultimate cry of the surety is: I would not have become surety if I had known or believed that I should have to pay the debt. This is as true of states as of individuals. It was to remove this delusion of suretyship with its snare of temptation that this section of the Constitution was adopted. It withheld from the constituted authorities of the state all power or function of suretyship.' " Green v. City of Mt. Pleasant, supra, 131 N.W.2d at 14–15.

Thus, the conclusion of the Iowa court seems to be that there is no loan of credit unless there is suretyship.

In Michigan, the case of City of Gaylord v. Beckett, 378 Mich. 273, 144 N.W.2d 460, held that a project under the Industrial Redevelopment Bond Act of 1963 did not constitute a "loan of credit" within the proscription of art. 7, § 26, Michigan Constitution. The court was, however, motivated by the fact that the mentioned provision was a part of a new constitution, for after alluding to various contentions of the opponents to the bonds concerning their evils the court said, 144 N.W.2d at 467:

" * * * The delegates to the 1961 Constitutional Convention brought the lending of credit provision into the 1963 Constitution against a line of decisions which flatly stated that revenue bonds are not within the prohibition of lending of cred-

it. [Citing cases.] These decisions have created for the constitutional language a meaning that excludes revenue bonds from the definition of a loan of credit."

In New Mexico, a strange situation arose, the court unanimously holding a statute authorizing the issuance of industrial development bonds by a city to be *unconstitutional* as violative of a constitutional provision proscribing a city's donating to private corporation, then, after the opinion had been issued, arranged for its withdrawal, and by a divided court, three to two, approved the act. Village of Deming v. Hosdreg Company, 62 N.Mex. 18, 303 P.2d 920. However, the lending of credit aspect was not presented in that jurisdiction.

Since the Kentucky court has said that in projects of the nature here under consideration there is no "lending of credit" and purported to justify its position, the situation in that jurisdiction is of significance. In Norvell v. City of Danville, Ky., 355 S.W.2d 689, 692, the court relying on two earlier opinions, Bennett v. City of Mayfield, Ky., 323 S.W.2d 573, and Faulconer v. City of Danville, 313 Ky. 468, 232 S.W. 2d 80, stated that as fully reasoned out in those opinions there was no lending of credit because "no *indebtedness* of the City of Danville is created." In the Bennett case, 323 S.W.2d at 576 it was said that since revenue bonds were not regarded as creating an indebtedness of the municipality within the meaning of the debt limit provisions of the constitution, the transaction might be held not to constitute a lending of credit. In Faulconer the court stated, 232 S.W.2d at 84, that the city became only a trustee, not a creditor or guarantor, the bonds did not constitute an obligation of the city, and that there was only the lending of the city's name and its commitment to render the described services and to lease the property for a consideration, collecting and dispensing the rents.

The constitution of Idaho proscribes a city's pledging its credit directly or indirectly to any corporation, and the court in Village of Moyie Springs, Idaho v. Aurora

Manufacturing Company, 82 Idaho 337, 353 P.2d 767, held a statute authorizing a municipality to issue bonds for manufacturing, industrial, or commercial enterprises to be in contravention of that provision. The opinion was forthright in condemning the proposal, 353 P.2d at 772:

"It cannot be questioned that the purpose of the act now before the court and the ordinance enacted by the plaintiff village pursuant thereto is to lend the credit and faith of the municipality in aid of the defendant corporation. * * *

"We are aware of decisions in other states upholding similar legislation. * * [Citing cases.]

"Some of these decisions are distinguishable from the present case by reason of differences in the constitutional provisions involved. But, we respectfully disagree with the reasoning by which the conclusion is reached in others, that projects such as we have here do not constitute a lending of the credit of the municipality. Such decisions read like apologies to constitutional limitations, dictated by expediency.

"It is obvious that one of the prime purposes of having the necessary bonds issued by and in the name of a municipality is to make them more readily salable on the market. Thus, the credit of the municipality is extended in aid of the project, regardless of the limitations placed upon the remedy of the purchaser. * * *"

Further reference to the Nebraska situation is warranted. That state has a constitutional provision that the credit of the state should not be given or loaned in the aid of an individual, association, or corporation, and under a law almost identical to the one here before us, the supreme court in 1957 held that in a case wherein the City of York proposed to issue revenue bonds for the purchase and lease back of a packing plant the constitution was contravened, the court saying:

"* * * It is clear that the framers of our Constitution had in mind a prohibi-

tion against giving or loaning the credit of the State or any subdivision thereof for a purely private purpose. * * * It is a prohibition * * * to protect the State and its political subdivisions against reckless financial involvement in private enterprises supposed to serve the public good but which are in fact dominated by private interest. * * *

"It is true that the revenue bonds are not a general liability of the city and they are not subject to payment through the exercise of the taxing power. But they do cast burdens upon the city with reference to their issuance and payment. The city and its officers are charged with the duty of fixing and collecting the rentals from which the revenue bonds are to be paid. This necessitates the execution of leases, the fixing of rentals, the taking of chattel mortgages on equipment to secure the payment of rent * * *. It imposes duties and responsibilities upon the city and its officers on matters which are private rather than public in character. The issuance of the bonds in the name of the city for the payment of the cost of the project evidences the fact that the credit of the city has been extended. The city is the payer of the bonds and it is primarily liable for their payment. The bonds become the obligations of the city. The fact that the means of payment is limited does not make it any less so. A failure of payment is a default by the city. The constitutional prohibition does not infer that the credit of the State or its political subdivisions may be given or loaned except when a general liability exists. The prohibition clearly provides that the credit of the State may not be given or loaned to an individual, association, or corporation under any circumstances. When the State or a political subdivision thereof becomes a payer of a revenue bond or any other evidence of indebtedness which is to be used in the accomplishment of a private as distinguished from a public purpose, the credit of the State has been given or loaned * * *." State ex rel. Beck v. City of York, 164 Neb. 223, 82 N.W.2d 269, 271-272.

Following this clearcut and positive decision, the people of Nebraska, apparently interested in lending public credit in support of private corporations for the purpose of industrial development, added to their constitution art. XV, § 16, stating, inter alia, that notwithstanding other provisions in the constitution revenue bonds for industrial enterprises might be issued, whereupon another suit was filed, State ex rel. Meyer v. County of Lancaster, 173 Neb. 195, 113 N.W.2d 63, challenging the issuance of the bonds, and the court held the statute to be constitutional, over the contention that it gave private corporations substantial benefit by saying, 113 N.W.2d at 68, "The effect is to loan the credit of the county and its tax exempt status to a private corporation. In a sense also, there is a donation of a property, yet all this is *specifically authorized* by the amendment." (Emphasis supplied.) This latter case was decided in 1962.

We will not pretend to say the kind of financing authorized by the legislature in ch. 1, art. 8 of Ch. 112, S.L. of Wyoming 1965, is good or desirable. Such financing has been resorted to because municipal bonds are exempt from Federal taxation, and small communities have been able to use this tax-exempt status to encourage local industrial development. No doubt it is only a matter of time until Congress will see fit to remove tax exemptions for municipal revenue bonds.

In the meantime, it is understandable that a number of state supreme courts have seen fit to strike down, as contrary to constitutional concepts, this kind of legislation. It was not without reason that the supreme court of Idaho, in Village of Moyie Springs, Idaho v. Aurora Manufacturing Company, 82 Idaho 337, 353 P.2d 767, 775, saw fit to point out that those industries benefited by revenue bond financing could have an advantage over other private-enterprise industries, resulting in a trend toward socialism.

■ However, we do not deem it our duty or prerogative to pass upon the virtues or evils of legislation. We do have the responsibility of saying in a given situation what the law is, but not the responsibility of saying what it ought or ought not be. Hence, we take the position in this case that it is within the power of the legislature to authorize or withhold authorization for financing by industrial revenue bonds—as long as constitutional limitations are not exceeded.

With respect to the limitation that a city shall not loan or give its credit to or in aid of a corporation, the legislature has taken pains to restrict and prohibit this from being done. Thus, in § 94(a) of art. 8, it has spelled out three different safeguards, which are:

1. "No bonds issued by a municipality or county under this article may be general obligations of the municipality or county."

2. "Bonds and interest coupons, do not constitute nor give rise to a pecuniary liability of the municipality or county or a charge against its general credit or taxing powers."

3. "These limitations shall be stated clearly on the face of each bond."

Section 95(a) of the act authorizes only security devices "that do not constitute a general obligation of the municipality or county." Section 95(b) provides a municipality or county shall not obligate itself except with respect to the project and the application of its revenues, and "shall not incur a pecuniary liability or a charge upon its general credit or against its taxing power." And § 95(d) again states no breach of any mortgage agreement may impose any "pecuniary liability" upon a municipality or county or any charge upon their general credit or against their taxing power.

In a similar revenue bond case, in Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5, 15, the supreme court of Iowa said: "[h]ere the city assumes neither primary nor secondary liability in any way." Also, the supreme court of Nebraska, which originally held Nebraska's revenue bond statute to be unconstitutional, in State ex rel. Beck v. City of York, 164 Neb. 223, 82 N.W.2d 269, 271, said: "It is true that the revenue bonds are not a general liability of the city and they are not subject to payment through the exercise of the taxing power."

If courts, which take opposite points of view relative to the lending of credit, can agree that revenue bonds such as those here involved are not a general liability of the city and are not subject to payment through the exercise of the taxing power, we ought to be justified in adhering to the principle that the legislature and bondholders themselves, and not the courts, will be responsible for whatever results from this type of financing.

We have to recognize the inherent right of parties to contract as they see fit. If a bond purchaser, with his eyes wide open, sees fit to purchase revenue bonds of the Frontier Project for the sake of a Federal tax advantage, he certainly will be on notice of the fact that there will never be any pecuniary liability against the City of Cheyenne, and that he will be able to look only to the revenues of the project and the project property itself for payment of his bonds. With it expressed clearly in the law and on the face of each bond that neither the credit nor taxing power of the municipality is pledged, no bondholder will ever be heard to say he was deceived or that he thought otherwise.

■ The constitutional provision we are discussing precludes a city from loaning or giving its credit to or in aid of an individual or corporation. This does not prohibit a city from aiding or benefiting a corporation, if its credit is not involved. Licenses and franchises are frequently granted by cities and counties to individuals and corporations. No doubt the recipients receive aid and a benefit, but no public credit is involved.

■ We have already reviewed the cases from other states which we deem important on the question of whether financing by industiral development revenue bonds con-

stitutes a lending or giving of public credit. There is no unanimity of opinion. Therefore, following the well-established rule in this jurisdiction that an act of the legislature will not be declared unconstitutional unless its unconstitutionality *clearly* appears, we will leave to the legislature the responsibility of deciding whether this type of financing is in the best public interest. See Kuntz v. Kinne, Wyo., 395 P.2d 286, 288; Bulova Watch Company v. Zale Jewelry Company of Cheyenne, Wyo., 371 P.2d 409, 417, Steffey v. City of Casper, Wyo., 357 P.2d 456, 468, modified on rehearing 358 P.2d 951.

■ The lease on the project property in this case grants to the Frontier Refining Company as lessee an option to renew the lease for four consecutive five-year periods or the option to purchase the project property for the amount required to pay the bonds in full, all costs and expenses incident thereto, and an additional nominal sum of $100.

Appellant, the city clerk, suggests the option constitutes a donation of city property contrary to art. 16, § 6, of the Wyoming Constitution. She admits, however, this issue has been decided in favor of the city in those jurisdictions which have held that the transaction does not amount to a lending of credit, and the inclusion of an option to purchase does not make any difference. Bennett v. City of Mayfield, Ky., 323 S.W. 2d 573, 576.

Courts have indeed usually upheld such options on the theory that the options are an appropriate and integral part of the entire transaction between lessor and lessee. Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629, 637; State ex rel. Meyer v. County of Lancaster, 173 Neb. 195, 113 N. W.2d 63, 68; Darnell v. County of Montgomery, 202 Tenn. 560, 308 S.W.2d 373, 374–375; Fairfax County Industrial Development Authority v. Coyner, 207 Va. 351, 150 S.E.2d 87, 93. There, of course, can be no doubt that a renewal or purchase option contained in a lease is supported by adequate consideration—the original considera-

tion. Braten v. Baker, 78 Wyo. 273, 323 P. 2d 929, 931, rehearing denied 325 P.2d 880.

We see no reason why we should not accept the reasoning of these cases and say the optional provisions of the Frontier lease do not constitute an unlawful donation of city property.

This brings us to a negative answer to question 3 as reserved to us by the district court, which means we answer such question by saying the financing authorized by ch. 1, art. 8, of Ch. 112, S.L. of Wyoming 1965, and by Cheyenne Ordinances 1535 and 1538 does not constitute the lending of public credit for a private purpose in contravention of art. 16, § 6, Wyoming Constitution.

## Question No. 1

The first question reserved to us by the district court is whether the industrial development projects act and city ordinances under consideration, together with the instruments executed in carrying out the Frontier project, contain delegations of power in contravention of art. 1, § 7, and art. 3, § 37, Wyoming Constitution.

Art. 1, § 7, simply declares absolute, arbitrary power over the lives, liberty and property of freemen exist nowhere in a republic. No suggestion of a proposed exercise of such power is made by the defendant, nor are we shown any authority or reason to believe there is a delegation of arbitrary power.

With respect to art. 3, § 37, it reads:

"The legislature shall not delegate to any special commissioner, private corporation or association, any power to make, supervise or interfere with any municipal improvements, moneys, property or effects, whether held in trust or otherwise, to levy taxes, or to perform any municipal functions whatever."

The only suggestion of a delegation of power in contravention of art. 3, § 37, is that the trustee's power to receive, have custody of and disburse the revenues derived by the city from the project is an in-

valid delegation. Defendant argues the rule announced by this court in Rodin v. State, Wyo., 417 P.2d 180, 186, is not here applicable because the industrial development projects act does not give any directions nor establish any standards to guide and control the trustee.

The act does recognize there may be a "trustee under a mortgage." We find it very clear, however, from numerous provisions of the act, the ordinances, and agreements of the parties, that the powers of any such trustee would be limited to receiving revenues from the project and applying them to a retirement of the bonds in accordance with the mortgage and agreement of the parties. In the Rodin case we said no powers were conferred nor duties imposed upon the escrow bank other than those inherently undertaken by all depositories of funds. The same is true here—no powers or duties are delegated to a trustee other than those inherently undertaken by a trustee under a mortgage.

The constitutional prohibition against delegation of power is intended to protect against the exercise of the taxing power and other purely municipal functions by officials not subject to the people's control. Evans v. West Norriton Tp. Municipal Authority, 370 Pa. 150, 87 A.2d 474, 479; Wilson v. School Dist. of Philadelphia, 328 Pa. 225, 195 A. 90, 99, 133 A.L.R. 1401; Board of County Commissioners of Albany County v. White, 79 Wyo. 420, 335 P.2d 433, 442.

Matters which are administrative only may be delegated without violating the constitutional prohibition against the legislature delegating to a special commissioner power to supervise or interfere with any municipal function. Stewart v. City of Cheyenne, 60 Wyo. 497, 154 P.2d 355, 356; Kleiber v. City and County of San Francisco, 18 Cal.2d 718, 117 P.2d 657, 659.

In State ex rel. Ferguson v. City of Pittsburg, 188 Kan. 612, 364 P.2d 71, 78–79, it was specifically held that an act authorizing cities to issue revenue bonds for specified purposes did not amount to an unlawful delegation of legislative power although it authorized issuance of bonds at any rate of interest, over any period of time, and for any amount. Also, in the Stewart case just cited our court said, if performance of municipal functions is under the control of elected municipal authorities, the constitutional provision prohibiting the legislature from delegating to any special commissioner power to supervise or interfere with any municipal function is not violated.

As to whether the performance of functions in the case at hand is under the control of elected municipal authorities, we point out that the city issues and sells the revenue bonds. The proceeds are deposited in the Project Acquisition Account with the trustee, who disburses pursuant to the city's instructions. Counter-signatures of two city officials are required. Rental and other revenues from the leased project are deposited in the Bond Fund, Administration Account, and Maintenance Fund. The funds are in the trustee's custody, but disbursements therefrom are specifically limited and purely administrative.

In Gregory v. City of Lewisport, Ky., 369 S.W.2d 133, 136–137, the court upheld the validity of an industrial revenue bond financing similar to the one considered by us and held there was no unlawful delegation of powers because no governmental powers were surrendered. What was involved, the court said, was simply details of a proprietary transaction.

In light of these considerations we would answer reserved question 1 in the negative, by saying provisions of the industrial development projects act, Cheyenne Ordinances 1535 and 1538, and instruments executed by the parties for the Frontier Project, do not contain delegations of power in contravention of art. 1, § 7, or art. 3, § 37, Wyoming Constitution.

### Question No. 2

The second question reserved to us is whether the financing authorized by the industrial development projects act and city

ordinances is for a public purpose as required by art. 13, § 3, Wyoming Constitution. Of course, the question assumes art. 13, § 3, requires such financing to be for a public purpose. Constitutions of other states may impose such a requirement, but we find nothing in art. 13, § 3, of our constitution which imposes such a requirement, unless we assume a tax or assessment is to be levied and collected, or that a debt is to be contracted.

The pertinent language contained in art. 13, § 3, as far as question 2 is concerned, is this:

"* * * no tax or assessment shall be levied or collected or debts contracted by municipal corporations except in pursuance of law for public purposes specified by law."

As near as we can tell, there has been no suggestion in the briefs or oral arguments to the effect that any tax or assessment is contemplated.

As far as a debt is concerned, our answer to question 3 is to the effect that Cheyenne's credit is not loaned or given. Inherent in that answer is a holding that no debt against the City of Cheyenne is being contracted. If we say, as we are saying, that no debt is being contracted by the municipality, then we have no question to answer as to whether a debt is contracted in pursuance of law for a public purpose specified by law.

However, it may be argued that it is elementary that municipal corporations may not engage in either governmental or proprietary functions which have no public purpose. See Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80, 82–83. In view of this, we think we should give some attention to the finding of a public purpose by the trial court.

The only concrete evidence which can be pointed to is the deposition of the Senior Vice President of Operations of the Frontier Refining Company. He states the 25-year-old plant's physical facilities are bordering on competitive obsolescence and, for

continuance of the Cheyenne operation to be warranted, substantial improvements and additions are essential; that for the most part the purchase price of some $18,000,000 will be used to discharge the indebtedness of the entire Frontier Refining Company properties; and that if the $4,500,000 is expended for modernization and expansion of the project it is "estimated" an additional thirty persons would be employed in the Cheyenne operations.

Although this testimony was meager, it was not controverted by the defendant, and there is authority for the proposition that judicial notice will be taken of the public economic benefits flowing from new or expanded industry. See City of Frostburg v. Jenkins, 215 Md. 9, 136 A.2d 852, 856; and Fairfax County Industrial Development Authority v. Coyner, 207 Va. 351, 150 S.E.2d 87, 92. In any event, in the absence of a showing to the contrary, we will not disturb the court's finding with respect to a public purpose, which finding was as follows:

"Plaintiff's acquisition of The Frontier Refining Company's oil refinery located in the City of Cheyenne, will promote the economic welfare of the City of Cheyenne and its residents in the following respects: Increase employment, stimulate industrial activity, augment sources of tax revenues, foster economic stability, and improve the balance in the City's economy."

Moreover, it is apparent to us that the legislature by authorizing the exact municipal function here involved, has impliedly determined that there is present whatever public purpose may be essential. Subsequent to the Frontier project being authorized, the legislature has amended the industrial development projects act and specifically declared projects under it to constitute public purposes. Ch. 95, § 1(b), S. L. of Wyoming 1967. This amendment tends to ratify and confirm the former implied determination of the legislature.

Whether a particular act or conduct is a "public purpose" is a matter of law for judicial determination and not a question.

of fact; however, where the legislative judgment as to a "public purpose" is apparent, that judgment will not be interfered with by the courts unless the judicial mind conceives it to be without reasonable relation to the public interest and welfare. Polanski v. Town of Eagle Point, 30 Wis.2d 507, 141 N.W.2d 281, 285; City of Tulsa v. Williamson, Okl., 276 P.2d 209, 214; Fairfax County Industrial Development Authority v. Coyner, 207 Va. 351, 150 S.E. 2d 87, 93; and Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80, 82–83.

Regardless of whether we base our decision on the testimony offered, or on a judicial determination, or on an apparent determination by the legislature, we are brought to the conclusion, as already stated, that the court's finding with respect to a public purpose should not be disturbed.

█ In the light of what we have said, we answer question 2 in the affirmative and say the financing authorized by the industrial development projects act and city ordinances fulfills whatever public purpose may be required by law.

### Question No. 4

█ The fourth question reserved by the district court is whether the industrial revenue bond financing authorized by the legislation we have under consideration contravenes the municipal debt limitations prescribed by art. 16, §§ 4 and 5, Wyoming Constitution. The sections referred to provide generally that no debt in excess of the taxes for the current year shall be created by any city, and that no city shall create any indebtedness exceeding four per-cent of the assessed value of taxable property within the city.

In Laverents v. City of Cheyenne, 67 Wyo. 187, 217 P.2d 877, 880–881, this court held generally that the purchase of property by a municipality, to be paid for wholly out of the income and revenue from the property and without any other liability on the part of the municipality, did not give rise to an "indebtedness" within the meaning of the constitutional debt limitations

now considered by us. This would be true, the court indicated, even if there was a mortgage, as long as the mortgage is payable wholly out of the income of the property purchased or by resort to such property.

There is ample authority from other jurisdictions for saying self-liquidating projects involving such industrial revenue bonds as are here involved do not create an indebtedness within the meaning of constitutional debt limitations. Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629, 636; State ex rel. County Court of Marion County v. Demus, 148 W.Va. 398, 135 S.E.2d 352, 359; Wayland v. Snapp, 232 Ark. 57, 334 S.W.2d 633, 637; Opinion of the Justices, 161 Me. 182, 210 A.2d 683, 699.

In answering previous questions, we have already taken the position that no debt is being contracted by the City of Cheyenne in connection with the issuance of revenue bonds under the industrial development projects act. It follows from this, without further explanations, that the city is not creating an indebtedness in excess of constitutional limitations.

We therefore answer question 4 in the negative and say the industrial revenue bond financing authorized by the act and ordinances referred to do not contravene the municipal debt limitations prescribed by art. 16, §§ 4 and 5, Wyoming Constitution.

### Question No. 5

█ The last of the reserved questions is this: Does the industrial revenue bond financing authorized by art. 8 and Ordinances 1535 and 1538, by providing for taxation of the project property, contravene art. 15, § 12, Wyoming Constitution, which exempts municipal property from taxation?

The constitutional provision referred to in this question was amended in 1956, and according to the joint resolution proposing the amendment, its purpose was to allow public property not used for a *governmental* purpose to be taxed. Therefore, as art. 15, § 12, now reads, the property of the United

States, the state, counties, cities, towns, school districts and municipal corporations shall be exempt from taxation, "when used primarily for a governmental purpose."

A Wyoming municipality has both proprietary and governmental powers, and when the City of Cheyenne acquires and leases the Frontier industrial development project property, it will be exercising a proprietary and not a governmental function. See Seaman v. Big Horn Canal Ass'n., 29 Wyo. 391, 213 P. 938, 940; and Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80, 84.

It follows that the project property will not be used primarily for a governmental purpose, and consequently it is quite proper for the legislature to subject it to taxation pursuant to the 1956 amendment to art. 15, § 12.

Therefore, our answer to question 5 is in the negative and to the effect that the financing authorized by the industrial development projects act and city ordinances of Cheyenne does not contravene art. 15, § 12, Wyoming Constitution.

### District Court Conclusions

In her appeal, the city clerk asserts the finding of the district court to the effect that acquisition of the Frontier property will promote the economic welfare of the City of Cheyenne is erroneous. In our consideration of question 2, we said we would not disturb the finding of the district court with regard to the Frontier project being for a public purpose. The conclusion reached at that point disposes of appellant's assignment of error on the court's finding of fact pertaining to a public purpose, and we need not comment further on such finding.

There are, however, certain conclusions of law which the defendant-clerk has objected to and now raises on appeal. Although nothing more than token argument has been made in support of these objections, we think we should list them and comment only briefly on each conclusion of law challenged in appellant's brief. The following paragraphs are sufficient for that purpose:

1. The industrial revenue bonds authorized by the act and ordinances here considered do not, as appellant contends, deprive Cheyenne taxpayers of property without due process of law and do not deny equal protection of the laws. Courts have generally held that acts authorizing public industrial revenue bonds do not violate constitutional due process provisions or deny equal protection of the laws, and we are shown nothing in the act or ordinances being considered which could give rise to a legitimate question of due process or equal protection. See State ex rel. Ferguson v. City of Pittsburg, 188 Kan. 612, 364 P.2d 71, 80; Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 803–804, 115 A.L.R. 1436, dismissed on appeal 303 U.S. 627, 58 S.Ct. 766, 82 L.Ed. 1088; and City of Frostburg v. Jenkins, 215 Md. 9, 136 A.2d 852, 854–855.

2. The industrial development projects act questioned in this litigation provides, in § 99, that the project is subject to taxation, but only if the project is leased to or held by private interests on both the assessment date and levy date in any year. Appellant challenges this as being in contravention of art. 15, § 11, Wyoming Constitution. What appellant overlooks, however, is that § 99 does not require the project to be leased to or held by the same "private interests" on the assessment date and the levy date. Two acts are essential in the fixing of a tax—(1) the assessment and (2) the levy. Properties ordinarily are taxable in private ownership regardless of changes in ownership and will be taxed if one person owns at assessment time and another owns at the time of the levy. In the case of projects such as we are considering, however, the project cannot be taxed unless it is leased to or held by private interests on both dates, although as we have said it can be different private interests. This situation considered, there is no lack of uniformity in assessment for taxation as required by the constitution.

3. Appellant suggests the proposed industrial revenue bond financing violates the provisions of art. 15, § 7, Wyoming Constitution, relating to depositories for public funds. However, the identical question was raised and settled contrary to appellant's contention in Rodin v. State ex rel. City of Cheyenne, Wyo., 417 P.2d 180, 189–190. Our holding in the *Rodin* case is sufficient to dispose of the question here.

4. Another question raised by appellant is whether the title to Chapter 112, S.L. of Wyoming 1965 (Original House Bill No. 9), is sufficient to embrace the subject of industrial development projects as contained in ch. 1, art. 8, of Chapter 112, in accordance with the requirements of art. 3, § 24, Wyoming Constitution, which reads in pertinent part:

"No bill, except general appropriation bills and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in its title * * *."

In 1963 the Wyoming Statute Revision Commission was authorized by the legislature to compile all the statutes of Wyoming relating to or concerned with cities and towns. Ch. 143, S.L. of Wyoming 1963. The Commission complied with this directive and the 1965 legislature enacted, as a municipal code, Chapter 112, S.L. of Wyoming 1965. The act involved in this suit appears as ch. 1, art. 8, Chapter 112. The title to Chapter 112 reads in pertinent part:

"AN ACT to provide for the organization, operation, and government of the cities and towns of the State of Wyoming * * *."

Therefore, Chapter 112 (Original House Bill No. 9) having been a bill for the codification and general revision of the laws relating to or concerned with cities and towns, art. 3, § 24, of the constitution had no application to it because it came under the exception pertaining to bills for the codification and general revision of the laws.

5. There is a suggestion by appellant that the industrial development projects act contravenes public policy and is invalid because it delegates unreasonable discretionary powers to the city, in that the act fails to provide for a maximum rate of interest on the bonds or a minimum price at which such bonds may be sold. We have already held there is no unreasonable or unlawful delegation of powers. Moreover, in our previous discussion of question 1 pertaining to the delegation of powers, we referred to State ex rel. Ferguson v. City of Pittsburg, 188 Kan. 612, 364 P.2d 71, 78–79, wherein it was held a similar act did not amount to an unlawful delegation of powers, even though the act in that case authorized the issuance of bonds at any rate of interest, over any period of time, and for any amount.

6. In the first six conclusions of law of the trial court findings were made to the effect that the city ordinances and all agreements and instruments pertaining to the Frontier project, including those for the purchase, leasing and mortgaging of the project, are valid and legal. Appellant challenges these conclusions of law claiming (a) Ordinance 1538 is invalid because the exhibits annexed to it were not published; and (b) the industrial development projects act does not authorize the acquisition of facilities already in existence.

(a) Section 15.1–16, W.S. 1957 (Complied 1965) requires every ordinance to be published at least once in a newspaper of general circulation within the city, before becoming effective. Ordinance 1538 was so published, but exhibits attached thereto were not published. These exhibits were copies of the asset purchase agreement, the indenture, and the lease having to do with the Frontier project. The ordinance itself did state that copies of these instruments were on file in the office of the city clerk and available for inspection. It is clear, of course, that the purpose of the statute requiring publication was fulfilled.

The public was advised of the nature of the ordinance, and copies of the instruments referred to therein were available (as stated in the ordinance). We accept the ruling of the trial court that the publication was legally sufficient. 5 McQuillin, Municipal Corporations (3rd Ed.), § 16.80, p. 304, and Dallasta v. Department of Highways of State of Colorado, 153 Colo. 519, 387 P.2d 25, 26–27, are authority for such ruling.

(b) We think the act does authorize the acquisition of facilities already in existence. In § 92(a) of art. 8, "project" is defined as any land, building or other improvement, and all real and personal properties necessary in connection therewith, "whether or not in existence," suitable for manufacturing or industrial enterprises. Also, § 93 grants to a municipality the power to acquire, whether by construction, "purchase," devise, gift, or lease, one or more projects. Thus, the act makes it eminently clear the legislature intended a city should be able to acquire facilities already in existence. See Massey v. City of Franklin, Ky., 384 S.W.2d 505, 506.

7. Appellant further attacks the validity of the Frontier project by claiming the acquisition of the project and the asset purchase agreement violate the general contracts statutes of Wyoming. The statutes referred to have to do with such matters as the sale of municipal property generally; contracts for public improvements generally; bonds for contractors; functions of the planning commission; competitive bidding on the letting of construction contracts; and competitive bidding in the sale of city property. We think procedures for acquiring properties and issuing bonds are specific and definite in the industrial development projects act. Special statutory authorizations contained in the act will necessarily supersede general statutory provisions, especially where (as happened in this instance) the general provisions were adopted prior to or at the same time of the special authorizations. Moreover, we are dealing with a situation

where property is acquired in the first instance subject to those procedures contemplated in the act. In this case the acquisition and the asset purchase agreement comply in all respects with the act and must therefore be considered legally sufficient. This is not to say future contracts having to do with the project might not come under certain of the general contracts statutes, where the contract is not a part of the original acquisition transaction.

## Summary

We have answered questions 1, 3, 4, and 5, as reserved to us by the district court, in the negative; and we have answered question 2 in the affirmative. In other words, our answer to all questions is to the effect that the industrial development projects act and related city ordinances do not contravene any of the constitutional provisions referred to. Therefore, as far as the constitutional questions raised are concerned, the act and ordinances are constitutional and valid.

We also have found no reversible error in any of the findings of fact or conclusions of law appealed from.

Such findings and conclusions are affirmed, with reserved questions answered as indicated in this opinion, and the case is remanded for the entry of judgment consistent with this opinion.

HARNSBERGER, C. J., not participating.

GRAY and PARKER, Justices (dissenting).

Without adopting any view of the prevailing opinion except that part which relates to the general and historical analysis of revenue bonds, we concede reluctantly that there is insufficient basis to hold the questioned legislation to be unconstitutional as it might conceivably apply to permissible factual situations, and on the negative approach that an act of the legislature will not be declared unconstitutional unless its unconstitutionality clearly appears, do not challenge the answers given to reserved

questions one through five. We do, however, find the opinion particularly fallacious in its statement answering question two, "Inherent in that answer [Cheyenne's credit is not loaned or given] is a holding that no debt against the City of Cheyenne is being contracted." This court has not heretofore had occasion to pass upon the meaning of "debts" as used in Art. 13, § 3, Wyo.Const., but that word has been defined as obligations or demands arising out of contracts, express, implied or quasi. Ballentine, Law Dictionary, p. 334 (2 ed.). In the instant case, § 11 of Ordinance 1538 provides:

"The provisions of this ordinance shall be deemed to be and shall constitute a contract between the City and holders from time to time of any Bonds and the coupons appertaining thereto and any of said holders may sue, in any action, in mandamus, injunction, or other proceedings, either at law or in equity to enforce or compel performance of all duties or an obligation required by this ordinance to be done or performed by said City. * * * "

Perhaps the writer of the opinion here has accorded his thinking on this subject with that of the Alabama and Iowa courts when they have said that the constitutional use of "loan of credit" meant suretyship and by that reasoning is saying that a "debt" is not a debt if there is any understanding by which the repayment of the amount is not to involve the use of tax revenues. However, we are unaware of any legal basis for such reasoning, and to us it is unquestionable that the framers of the Wyoming Constitution recognized an elementary principle when in Art. 13, § 3, they restricted the powers of municipal corporations in the contracting of debts except in pursuance of law for public purposes specified by law. Such restriction is consistent with this court's interpretation of Art. 16, Wyo. Const., "Public Indebtedness," when we said in Laverents v. City of Cheyenne, 67 Wyo. 187, 217 P.2d 877, 882, 883, that to constitute a debt within the provisions of Art. 16, § 5, "it must be payable in whole or in part, out of the general resources of the municipality."

Although we see no necessity at this time of addressing ourselves to the premise that judicial notice may be taken of the public economic benefits flowing from new or expanded industry, we recoil from the intimation that the legislature has given carte blanche authority to municipalities to borrow millions of dollars with only a pro forma determination of benefits. Obviously, in the instant case no "new" industry is being brought into Cheyenne, and we fail to find any real indication that this is to be an "expanded" industry. The Senior Vice President of Operations of the Frontier Refining Company stated that the twenty-five-year-old plant's physical facilities are bordering on competitive obsolescence and for continuance of the Cheyenne operation to be warranted, substantial improvements and additions are essential; that for the most part the purchase price of some $18,000,000 will be used to discharge the indebtedness of the entire Frontier Refining Company properties; that if the financing is consummated, approximately $4,500,000 would be expended on the Cheyenne refinery to improve and modernize it and an *estimated* additional thirty persons then required in Cheyenne. Nothing was presented to show that the obsolescence would be cured by the expenditure of the proposed sum or that the plant would be a successful or going concern if the bonds were issued. We fail to see a situation such as this as comparable to a new or expanded industry, and since the evidence fails to constitute a clear showing that a public purpose is to be served, we would accordingly hold defendant's charge of error as to the court's finding to be well taken and reverse the judgment on this ground.