LAWRENCE V. BOWLEY ET AL., APPELLANTS, V. CITY OF OMAHA, A MUNICIPAL CORPORATION, ET AL., APPELLEES.

149 N. W. 2d 417

Filed March 17, 1967. No. 36411.

516

Charles S. Reed and James F. Green, for appellants.

Herbert M. Fitle, Edward M. Stein, Donald L. Knowles, James M. Murphy, Frederick A. Brown, and White, Lipp, Simon & Powers, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is an action in equity for a declaratory judgment and an injunction to declare ultra vires and void a contract between the City of Omaha, hereinafter referred to as City; the County of Douglas, hereinafter referred to as County; the Airport Authority of the City of Omaha, hereinafter referred to as Authority; and Eugene C. Eppley Foundation, Inc., hereinafter referred to as Eppley; and to enjoin the City from condemning plaintiffs' land pursuant to the contract for a park. The trial court found against plaintiffs and dismissed the

petition. Plaintiffs have perfected an appeal to this court.

There is no dispute of fact in this case. The evidence was for the most part received by stipulation of the parties. The questions to be resolved relate solely to the validity of the agreement between the defendants.

Plaintiffs are the owners as joint tenants of certain real estate, the description of which is immaterial herein, bordering the Missouri River and adjoining land owned by Authority.

For purposes of discussion herein, it is only necessary to summarize and set out portions of the agreement. Authority grants to City and County the use for park purposes and approaches approximately 400 acres belonging to Authority, lying between the existing levee and the Missouri River, with the stipulation that the land shall not be improved, operated, or maintained in such a manner as to impair the visibility or constitute an obstruction to the flight of aircraft approaching or departing from Authority. Authority further reserves the right to withdraw portions of its land from park purposes when and as needed for purposes of Authority.

City and County agree to establish and create a public park to be known as Eppley Park, which shall embrace the 400 acres belonging to Authority and the real estate involved herein, which is to be acquired by condemnation if negotiation fails. City and County agree to apply for federal participation to the extent of 30 percent of the acquisition cost under the Open Space Act. It is also agreed that Leo Daly Company shall be engaged to prepare a comprehensive development plan for Eppley Park, and Eppley agrees to pay the fees and charges for said Leo Daly Company up to a maximum of $10,000.

Articles VII, VIII, IX, and X of the agreement are as follows: "VII. Foundation agrees to contribute to City seventy (70%) percent of the reasonable cost of acquir-

ing the privately owned land described in Article III above, provided:

"(a) If said land is acquired through negotiation and purchase, Foundation shall approve the purchase price thereof, and if Foundation shall refuse to approve such purchase price, this Agreement shall terminate and the parties shall stand mutually and reciprocally released from any liability on account hereof;

"(b) If said land is acquired through proceedings in condemnation under the exercise of City's power of eminent domain, then Foundation obligates itself in all events to pay seventy (70%) percent of the condemnation award or judgment therefor as finally adjudicated (exclusive of costs or other expense of said proceedings), unless on or before the forty-fifth day after the date of the award of the appraisers in the proceedings in County Court, Foundation shall serve upon City or its counsel a written notice that Foundation has withdrawn its financial support, whereupon this Agreement shall terminate and the parties shall stand mutually and reciprocally released from any liability on account hereof.

"VIII. City and County shall jointly undertake, diligently pursue and expeditiously perform and complete on a high standard of quality the improvement of the Eppley Park in conformity with said approved development plan and in accordance with the drawings and specifications thereof and under the general verification of the Leo Daly Company. As their respective shares thereof, County shall primarily have responsibility for the work and bear the cost of installing roads and parking areas and City shall primarily have responsibility for the work and bear the cost of installing the other improvements specified in said approved development plan, it being contemplated that the aforesaid expenditures for each share will be approximately equal and each will cost not less than One Hundred Fifty Thousand Dollars ($150,000). It is agreed that said Eppley Park

shall be ready for public use in a completed state not later than June 15, 1970.

"IX. County undertakes, assumes and agrees to maintain the said Eppley Park and all improvements, roads and facilities thereon located, upon a high standard of quality and will provide proper and adequate security personnel. City agrees through its Park and Recreation Department or other department to which such activities may be assigned by City to promote and supervise recreational programs.

"X. It is expressly agreed that Foundation has offered the financial assistance aforesaid and agreed to make the required contribution to the acquisition of the Eppley Park in reliance upon the promises and agreements of City, County, and Authority as herein set forth. City, County, and Authority hereby expressly grant and agree to accord to Foundation, acting by or through its officers, attorneys or other authorized representatives, the right at all reasonable times to inspect the work in progress upon and the quality of maintenance of the said Eppley Park, to examine all records, accounts, contracts and papers pertaining thereto, with right to make copies thereof, or abstracts therefrom and to enforce compliance with the terms of this Agreement."

Exhibit B indicates that the officers of Eppley were approached in the summer of 1964 by the parks and recreation committee of the Omaha Chamber of Commerce for financial assistance in the acquisition of certain river-front land, including the property of the plaintiffs, for the purpose of developing and dedicating the same as a "River Front Park." In support of their appeal, the Chamber of Commerce committee prepared and circulated to the directors of Eppley a brochure which is a part of exhibit B, explaining in detail the nature of the project and the public funds which were available for its acquisition, development, maintenance, and operation. Eppley's board of directors approved

the project and, subsequent thereto, on September 29, 1964, the contract in question was executed.

It is evident from exhibit B and the contract itself that this project was instigated by various groups, organizations, and civic-minded citizens. Its purpose was to establish a river-front park, adjoining and east and north of the land of Authority and encompassing in excess of 900 acres of river-front property. Included in the area are native trees, shrubs, and flora; interesting terrain; and random outcroppings of rock and shale. A river-front park in this location will be within easy access of the center of Omaha.

Stripping plaintiffs' assignments of error of all surplusage, we conclude that the basic issue involved herein is one of delegation of powers.

A city has no right or power to enter into contracts which curtail or prohibit the exercise of its legislative or administrative authority. See Seidel v. City of Seward, 178 Neb. 345, 133 N. W. 2d 390. A county board may not delegate its powers involving the exercise of judgment and discretion, but duties which are purely ministerial and executive may be delegated. See Dunn v. Dixon County, 102 Neb. 1, 165 N. W. 959.

There is quite a difference between a delegation of authority to private individuals and the initiation of governmental action by private individuals where the ultimate decision to act must be made by government officers. The case of Anderson v. Carlson, 171 Neb. 741, 107 N. W. 2d 535, 83 A. L. R. 2d 831, cited by plaintiffs, involves the former. The contract herein is an instance of the latter.

Plaintiffs contend that City by this contract has delegated its power of condemnation to Eppley. It is evident that plaintiffs are using suspicion, conjecture, and inferences for substance. Plaintiffs insist that Eppley's "absolute" control of price gives it control of the condemnation and in essence City by contract has waived its power to make any determination concerning the ex-

cessiveness of the condemnation award, or, more accurately, the acceptance or rejection of the award. The contract does not bind City to pay any part of the award regardless of amount. On the other hand, City may proceed whether Eppley desires to do so or not. Eppley, on its original solicitation by the Chamber of Commerce committee, agrees to provide money to secure the land for park purposes, but only if the land can be secured for a price agreeable to it, which we assume to be within the $350,000 figure suggested to it as the necessary contribution for land acquisition for the project. If our calculations are correct, based upon a gift of $350,000 and 600 acres of land (exhibit B puts it at 520 acres), the award could total in excess of $700 per acre, and at 70 percent would still be within $350,000. This does not mean that Eppley has fixed a price for plaintiffs' land. As explained in the next paragraph, it merely keeps Eppley within the ambit of the proposal accepted by its board of directors.

Plaintiffs complain that the contract permits Eppley to terminate the agreement but has no similar provision for City and County. It is City which is to acquire the land by negotiation or by condemnation. The contract provides Eppley will pay 70 percent of the condemnation award. The other 30 percent is to be financed from federal funds. In the contract, Eppley reserves the right to withdraw its financial support within 45 days of the condemnation award. This is understandable. Without an escape clause, Eppley would be giving a blank check for 70 percent of the award regardless of amount. Plaintiffs are wrong in assuming that there is no escape clause for City. If Eppley does not pay the award, City may abandon the condemnation if it does not want to go ahead, or it may proceed without Eppley's participation. Under the provisions of section 76-711, R. R. S. 1943, City has still 15 days to abandon the condemnation even if Eppley should exercise its option on the 45th day. The right of Eppley to withdraw its offer for a limited

period in no way infringes on the exercise of judgment and discretion by City.

It may be pertinent to observe that plaintiffs have on six different occasions offered the area in question to City as a landfill site for the disposal of refuse, at a rate ranging from $183,600 to $277,750 per year. One of these offers was accepted by the city council, but vetoed by the mayor who gave as his reason its proximity to the Airport and his belief that the rental fee to be charged was out of line when contrasted with the value of the land. This veto was sustained. Plaintiffs infer ulterior motives in the present contract because the chairman of Authority is a director of Eppley. All of this is of no moment except as it may indicate the dispute on valuation which may arise in a condemnation, and the need for Eppley, who is providing the major part of the acquisition funds, to have an escape clause.

It appears to us that the conditions attached on the part of Eppley, if they may be so construed, are only those which insure that it will not be called upon for a blank check and that any donation made will be used for park purposes. At most it was an offer made to public bodies for a purely public purpose. Those bodies have accepted the conditions. Those conditions were merely the basis of the gift. The acceptance by the public bodies was their own affirmative action. The contract does not deprive any of the public bodies of any discretion which public policy demands should be left unimpaired. On this point, their position is not too different from that of the city in Allebach v. City of Friend, 118 Neb. 781, 226 N. W. 440, where we specifically provided that if funds were accepted for hospital purposes, the condition of the gift should be observed.

A gift for a public purpose may be tendered to a city upon conditions or reservations so long as those conditions or reservations do not unreasonably interfere with the municipal use and enjoyment of the property. Without such a rule, donations for public improvements would

be seriously curtailed if not entirely eliminated. As we construe the contract, the control of the park will be in the public bodies, and it will be used exclusively for public purposes.

Section 14-374, R. R. S. 1943, empowers cities of the metropolitan class to acquire real estate by gift, purchase, bequest, or condemnation for public purposes, and includes parks in such purposes. Section 23-819, R. S. Supp., 1965, grants similar powers to counties. There is no question in this state a municipal corporation may accept funds conditionally or with reservations for purposes germane to the objects of the corporation so long as the conditions do not unreasonably interfere with public use and enjoyment, and when accepted a trust is imposed upon the municipality to perform, in accordance with the conditions. See Ash v. City of Omaha, 152 Neb. 393, 41 N. W. 2d 386.

Despite plaintiffs' protestations, the acceptance of donations as an inducement for a public improvement is not uncommon in this country. The general rule is enunciated in 38 Am. Jur., Municipal Corporations, § 561, p. 249, as follows: "* * * it is held by the weight of authority that an offer by a landowner to pay a certain sum or a certain proportion of the cost if a particular public improvement is constructed near his land is not necessarily illegal, and that if the board of public officers intrusted with the duty of deciding whether the improvement shall be constructed and where it shall be located determines that public necessity and convenience require it to be laid out as asked for, it is not unlawful for it to take the offer into consideration."

Plaintiffs seek to distinguish City of Omaha v. Megeath, 46 Neb. 502, 64 N. W. 1091, and Browne v. Palmer, 66 Neb. 287, 92 N. W. 315, in which this court enforced the conditions of an agreement, on the premise that no question was raised as to the power of the city to make the agreement. It is true this point was not discussed in those opinions, but it was certainly raised and briefed

and was supported by substantial authority in City of Omaha v. Megeath, *supra*, as set out at pages 504 and 505 of 46 Nebraska. The substance of the opinion would indicate that the court in its discussion assumed the legality of the transaction on the facts stated.

Plaintiffs argue that the contract allows Eppley to select plaintiffs' land as its target, and that the substance of the contract is that the City is lending its name to Eppley for the purpose of condemning the plaintiffs' land. This contention finds no basis in the contract or the stipulated facts. The reasonable inference is that certain groups, organizations, and civic-minded individuals, desirous of having a river-front park, did urge location of a park in the area embracing plaintiffs' land. The contract itself suggests that this particular site is the most practical and desirable for the location of a river-front park to best serve the interests of the City.

Further answering plaintiffs' contention, the power to decide whether or not there should be a condemnation does not rest with Eppley. The condemnation ordinance was the exclusive decision and action of the city council. The power of eminent domain is an attribute of sovereignty inherent in the state, and only those agencies to whom the Legislature has delegated the power can exercise the right, and it must be exercised only on the occasion and in the mode or manner and by the agency prescribed by the Legislature. State ex rel. Nelson v. Butler, 145 Neb. 638, 17 N. W. 2d 683. There is no violation of this principle in the contract.

Plaintiffs argue the contract permits Eppley to name the architect. We do not so construe it. There is nothing in the agreement to indicate Eppley suggested the architect, but even if this were a fact, what is said above is applicable and the action is that of the political subdivisions involved when they accepted the offer. Certainly, for a public project of this nature, the services of an architect are required by good business practice. Here the most that can be said is that Eppley has assumed the

obligation to pay for the services of the architect up to a maximum of $10,000. The political subdivisions in any agreement made with the architect can certainly limit their obligation.

Plaintiffs argue that even if we hold a delegation of power to be valid herein, in any event there are no standards spelled out in the ordinance in which City accepted "all the obligations" contained in the agreement with Eppley. First, there is no delegation of powers. Second, we reiterate, the contract is only the basis of a gift. Eppley is providing money under certain stipulated conditions which the public bodies involved have accepted. None of these conditions impinge in any way on the discretion of the public bodies so as to be offensive to public policy. The conditions attached are only those which insure the donation will be used for park purposes.

Plaintiffs further argue that because the acquisition and maintenance of a park are governmental functions, the municipality cannot make a contract which endures beyond the terms of the officials making the agreement. Their brief suggests that the term of the councilmen who made this agreement in 1964 ended in 1965. Plaintiffs cite Leidigh v. City of Nebraska City, 138 Neb. 136, 292 N. W. 115, to demonstrate the invalidity of the contract. That case involved a purchase of land for park purposes, with payments extending over a period of 7 years with a reversion of title to grantors if the city defaulted on any installment. It has no application herein. While the contract may in a measure circumscribe the legislative powers of successive councils, it does not do so unlawfully. The 1963 Legislature enacted L.B. 756, which became effective July 5, 1963. (Laws 1963, c. 481, p. 1549.) Sections 1 and 2 of that act are now sections 23-820 and 23-821, R. S. Supp., 1965. They are as follows: "Any city, village, school district, or county shall have the power to join with any other political or governmental subdivision, or with any agency, or public cor-

poration, whether federal, state, or local or with any number of combinations thereof, by contract or otherwise in the joint ownership, operation, or performance of any property, facility, power, or function, or in agreements containing the provisions that one or more thereof operate or perform for the other or others, this power as above set forth, to be only for the express purpose of acquiring, holding, improving and operating any park, playground, swimming pool, recreation center, or any other recreational use or facility. Each such political or governmental subdivision shall also have power to acquire, hold, improve and operate any park, playground, swimming pool, recreation center, or any other recreational use or facility. For the exercise of the powers above set forth, each such political or governmental subdivision shall have the power to levy a tax, to be known as a park and recreation tax, upon all the taxable property in its jurisdiction, except intangible property. This levy may be accumulated as a sinking fund from fiscal year to fiscal year to provide funds for the purpose of acquisition, holding, improvement and operation of any park, playground, swimming pool, recreation center, or any other recreational use or facility." § 23-820, R. S. Supp., 1965.

"For the specific purposes set forth in section 23-820, any city, village, school district or county shall have the power to receive (1) any grant or devise of real estate, (2) any grant or gift or bequest of money or other personal property, and (3) any other donation in trust or otherwise." § 23-821, R. S. Supp., 1965.

It is apparent that if Eppley were not a party to the contract, the public bodies were expressly authorized to contract among themselves as they did, and such contract would be binding upon successive councils. We have previously discussed the relation of Eppley to the contract.

To sustain their contention of the delegation of powers, plaintiffs refer to Eppley as the enforcer of the contract.

True, article X does provide that Eppley has the right "to enforce compliance with the terms of this agreement." Does this give Eppley any rights it would not have if these words were omitted from the contract? As suggested heretofore, our law is clear, if a municipal corporation accepts public funds on certain conditions, those conditions may be enforced. Allebach v. City of Friend, 118 Neb. 781, 226 N. W. 440; Ash v. City of Omaha, 152 Neb. 393, 41 N. W. 2d 386.

Finally, plaintiffs urge that Authority has exceeded its power in lending its land for park purposes. They contend that unless the park is directly related to the airport function, its action is ultra vires and void. Here again plaintiffs confuse shadow with substance. Authority is a body corporate and politic, constituting a public corporation organized and existing under and by virtue of sections 3-501 to 3-514, R. R. S. 1943. Airport authorities are agencies of the cities establishing them. Without extending this opinion by analyzing the provisions of the statute, suffice it to say that under subsection (5) of section 3-503, R. R. S. 1943, airport authorities have the power to sell, lease, or otherwise dispose of property not needed for airport purposes. Further, subsection (10) of section 3-504, R. R. S. 1943, provides as follows: "To include in such project, subject to zoning restrictions, space and facilities for any or all of the following: Public recreation, business, trade or other exhibitions, sporting or athletic events, public meetings, conventions, and all other kinds of assemblages, and in order to obtain additional revenues, space, and facilities for business and commercial purposes. Whenever the authority deems it to be in the public interest, the authority may lease any such project or any part or parts thereof, or contract for the management and operation thereof or any part or parts thereof. Any such lease or contract may be for such period of years as the authority shall determine; * * *."

Without considering the apparent practicalities of the

present situation, we construe the statute to be broad enough to permit Authority to loan any portion of its property not needed for airport purposes to City, which created it, for park purposes. In doing so, Authority has protected the use of its facilities and has enhanced the utilization of the land within the public-use objective of its powers.

For the reasons given, we find there is no merit to any of the numerous objections raised by plaintiffs, and affirm the judgment of the trial court.

AFFIRMED.