George FRANK, as Mayor of the City of
Cody, Wyoming, Appellant
(Defendant below),

v.

CITY OF CODY, Wyoming, Appellee
(Plaintiff below).

No. 4833.

Supreme Court of Wyoming.

Dec. 9, 1977.

Robert D. Olson, Goppert, Fitzstephens, Day & Olson, Cody, signed the brief and waived oral argument on behalf of appellant.

George A. Clarke, Lusk, Sp. Counsel to City of Cody, signed the brief and waived oral argument on behalf of appellee.

V. Frank Mendicino, Atty. Gen., Cheyenne, signed the brief by the Office of Atty. Gen., State of Wyoming, and waived oral argument.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

This is a case in which this court for the first time will consider an application of the Wyoming Joint Powers Act, §§ 9–18.13 to 9–18.20, W.S.1957, 1975 Cum.Supp., authorizing counties, · municipal corporations, school districts, community college districts or special districts to jointly exercise a power to provide a facility or function held in common. The City of Cody, appellee-plaintiff, joined with the Towns of Fort Laramie, Guernsey, Lingle, Lusk, Pine Bluffs, Torrington [1] and Wheatland to organize, by authority of the Joint Powers Act, a nonprofit corporation, now known as the Wyoming Municipal Power Agency, which we shall refer to as the Agency, to provide electrical power and energy to their inhabitants. Each of those municipalities had been and is engaged in the activity of selling and distributing electricity to its citizens.

The claim is undisputed· that the United States Bureau of Reclamation, their source of electrical power, has reached its capacity to furnish such energy beyond present allocations and other sources to meet future expanding needs had to be sought. The Agency entered into a participation con-

---

1. The Town of Torrington has since withdrawn from the corporation.

tract, with several other entities,[2] to become an owner, as a tenant in common, with a 1% interest, in the Laramie River Electric Generation and Transmission System, which we shall refer to as the System, now under construction near Wheatland, Wyoming, to supply more electricity than presently available.

In order to finance participation, it is necessary that the Agency borrow money, through the issuance of tax-free revenue bonds, secured by a pledge of payments to be received by the Agency from the participating municipalities under a power contract between the municipalities and the Agency. The Agency undertakes to furnish all electrical requirements of municipalities, at rates fixed by the power contract formula. Under that contract, the Agency will not only acquire the interest in the System but enter into a master contract with the Bureau of Reclamation for resale to the municipalities of electrical power and energy allocated to the municipalities.

Issuance of the tax-free revenue bonds is being stayed pending refusal of the mayor of the City of Cody, appellant-defendant, to sign on behalf of the city, the Wyoming Municipal Electric Joint Powers Board Agreement, which would activate and place the whole venture into effect. The city council of Cody has, by resolution and ordinance, regularly approved the transaction and directed the mayor to sign the agreement. The mayor bases his refusal upon assertions of unconstitutionality and illegality in several aspects. The city initiated an action seeking a declaratory judgment against the mayor for settlement of the several questions raised. The trial judge held in favor of the city on all issues, declaring the plan constitutional and legal in all particulars and adjudging the mayor obligated to sign the necessary contracts.

The mayor appeals [3] and raises the same questions presented to the district court:

*Constitutional*

1. Whether the trial court erred in finding the Agency and/or the Agency plan did not contemplate an unconstitutional delegation of powers.

2. Whether the trial court erred in finding the Participation Agreement did not require the Agency to enter into an unconstitutional loan of credit.

3. Whether the trial court erred in finding the Joint Powers Act did not encompass an unconstitutional statutory incorporation by reference.

4. Whether the trial court erred in finding the Cody Power Contract did not constitute an unconstitutional municipal debt or a revenue bond.

*Statutory*

5. Whether the trial court erred in finding there is sufficient legal authorization for the Agency to undertake its proposed transactions.

6. Whether the trial court erred in finding the Agency will not use the Laramie River Project for purposes other than those permitted by the Act.

7. Whether the trial court erred in finding the Power Contracts are not impermissible due to their requirements nature and/or their fixed rate formula.

8. Whether the trial court erred in finding the Agency's revenue bonds are not

---

**2.** Basin Electric Power Cooperative, a generation and transmission cooperative which serves local rural electrification cooperatives which are not profit-making companies; Tri-State Generating & Transmission Association, Inc., another non-profit generation and transmission cooperative; Missouri Basin Public Power Financing Corporation, a non-profit corporation; City of Lincoln, Nebraska, a Nebraska municipality; and Heartland Consumers Power District, a political subdivision and public corporation of the State of South Dakota.

**3.** The appeal initially filed in this court was dismissed because of failure to serve the Wyoming Attorney General with a copy of the proceedings, as required by § 1–1061, W.S.1957, in light of constitutional challenges asserted. He has since entered an appearance before the district court and has filed a brief in this appeal, arguing only with respect to issues 1, 2 and 8, expressing the view that no statutory or constitutional impediments exist on those points in question.

illegal for failure to comply with the Political Subdivision Bond Election Law.

We will affirm the district court.

1. Is there an unconstitutional delegation of powers? Section 37, Article III, Wyoming Constitution, provides:

"The legislature shall not delegate to any special commissioner, private corporation or association, any power to make, supervise or interfere with any municipal improvements, moneys, property or effects, whether held in trust or otherwise, to levy taxes, or to perform any municipal functions whatever."

This question is in two parts: first, the relationship between the separate municipalities, including Cody, with the municipal power Agency they have created and, second, the relationship between the municipal power Agency and the System.

In *Stewart v. City of Cheyenne*, 1944, 60 Wyo. 497, 154 P.2d 355, it was pointed out at some length by this court that the purpose of § 37, Article III was to prevent the legislature, either directly or indirectly, from taking away municipal powers from municipal authorities and conferring them on some commission in no way connected with the regularly-constituted municipal authority, subject to the will of the municipal inhabitants and that there must be control by regularly-elected municipal officers in the creation of bonded indebtedness. Stewart goes on to say that administrative powers of a municipality may be delegated, as long as they are subject to direction by the governing body of the city.

The mayor asserts that the city would relinquish its control to determine what price Cody will have to charge its residents for electrical energy because under the power contract, the Agency would, for a period of 40 years, have entire control over its municipal electric supply and there would be no popular control over the Agency by the residents of the municipality nor would Cody have any control over the price charged for electricity obtained from the System by the Agency.

It should be pointed out that Cody would have representation on the joint powers board of the Agency in accordance with the provisions of § 9–18.17(a)[4] of the Joint Powers Act. In turn, the Agency has representatives on the Management, Engineering and Operating and Auditing Committees of the System.

As we see the function of the Agency, its role is to acquire electrical power for the member municipalities. Cody would now deal with respect to its source of supply with the Agency, rather than directly with the Bureau of Reclamation, with the Agency having the added responsibility of securing additional sources of electrical energy, at the moment acquiring an interest in the System for that purpose. The bargaining power of Cody would seem to be enhanced by joinder with others in a like position, none of whom had electric generating plants of their own. All participating municipalities buy electric power at wholesale and sell to their citizen consumers at retail.

In *Uhls v. State of Wyoming ex rel. City of Cheyenne*, Wyo.1967, 429 P.2d 74,[5]

4. Section 9–18.17(a) provides as follows:

"(a) An agreement pursuant to this act [§§ 9–18.13 to 9–18.20] may create a joint powers board to conduct a joint or cooperative undertaking. A joint powers board shall consist of not less than five (5) and not more than ten (10) members, all of whom shall be qualified electors of the county or counties in which the facility operates. Members of a joint powers board shall be appointed by the governing bodies of the participating agencies in any proportion or number the bodies meeting in joint session feel would adequately reflect their interest. The initial appointments shall be by mutual agreement with staggered terms of one (1), two (2) and three

(3) years with right of reappointment. Thereafter, appointments for a full term shall be for three-year staggered terms. Vacancies for unexpired terms shall be filled by appointment by governing body of the participating agencies acting jointly. Members of the board may be removed for cause by the joint action of the governing bodies of the participating agencies."

5. *Uhls* is cited quite often by the City of Cody. That case was decided when this court consisted of four members. There was an even split, in part, which resulted in an automatic affirmance so there could be no majority opinion. No weight can be given the affirmance of a

an evenly split-decision case coming out of this court, Justice McIntyre, speaking for only two members of the then four-justice court, summarized the rule, with respect to the delegation of power under the constitutional provision with which we are concerned:

"The constitutional prohibition against delegation of power is intended to protect against the exercise of the taxing power and other purely municipal functions by officials not subject to the people's control. [Citing cases.]

"Matters which are administrative only may be delegated without violating the constitutional prohibition against the legislature delegating to a special commissioner power to supervise or interfere with any municipal function. [Citing cases.]"

In *Uhls*, then, the opinion author concluded that when the details of a "proprietary" transaction only are involved, there is no unconstitutional delegation of powers because the constitutional provision relates only to "purely" municipal or governmental functions of a city. Because of affirmation of those principles by *Powers v. City of Cheyenne, supra,* footnote 5, we consider those concepts to be the latest expression of this court.

The reason in this case for drawing the narrow but important distinction between "municipal" and "proprietary" functions, lies in the fact that the operation we are considering is a proprietary function rather than governmental. This distinction is brought sharply into focus by *Town of Pine Bluffs v. State Board of Equalization*, 1958, 79 Wyo. 262, 333 P.2d 700, where it was held that a municipality, engaged in the business of selling electricity to its inhabitants, is not completely performing within a municipal or governmental sphere when it engages in an activity of a private or commercial nature as a source of profit. This court then held that towns, operating an electric utility, are not exempt from taxation by the State under § 12, Article XV, Wyoming Constitution.[6] It went on to announce that when a municipality engages in business, as an electric utility, it is acting in a private or proprietary capacity in competition with private enterprise and should be treated no differently than the latter.

Because the operation of an electric utility is a proprietary and not a governmental function of the City of Cody, § 37, Article III, is not applicable and there is no unconstitutional delegation of a municipal function to the Agency.

On the second part of the question, as to whether there is an unconstitutional delegation of powers from the Agency to the System, we likewise find no objection. There has not been shown to us nor can we see any reason why when the participating municipalities bond together, each represented on a joint powers board, that the

judgment by an equally-divided court for the reason that such decision is not to be considered as "settling any principle." *McFarland v. Railway Officials' and Employees' Acc. Ass'n of Indianapolis*, 1894, 5 Wyo. 126, 147, 38 P. 347, 27 L.R.A. 48, 63 Am.St.Rep. 29, reh. den., 5 Wyo. 126, 38 P. 677. See other cases in *Town of Lovell v. Menhall*, Wyo.1963, 386 P.2d 109, an opinion written in an appeal culminating in an equally-divided court. *Uhls'* value as authority is only so good as what life might have been breathed into it by subsequent opinions, in other cases. While there were opinions, designated as dissenting opinions, there was no majority as such. The so-called dissent did not adopt the views of the "prevailing" opinion. In *Reed v. City of Cheyenne*, Wyo. 1967, 429 P.2d 69, a companion case to *Uhls*, there was again a split, two judges only concurring in the result but not the prevailing opinion. In *Powers v. City of Cheyenne*, Wyo. 1967, 435 P.2d 448, reh. den. 436 P.2d 961, there was a majority opinion, which gave life to *Uhls* on the question of delegation of powers. Other questions answered in *Uhls*, not pertinent here, were also given value. *Uhls* is therefore a case which must be cited with caution.

6. Section 12, Article XV, provides:

"The property of the United States, the state, counties, cities, towns, school districts and municipal corporations, *when used primarily for a governmental purpose*, and public libraries, lots with buildings thereon used exclusively for religious worship, church parsonages, church schools and public cemeteries, shall be exempt from taxation, and such other property as the legislature may by general law provide." (Emphasis added.)

details of the task of building or operating an electric plant cannot be left to others. It has not been shown to us nor can we see any delegation of municipal powers in this part to a "commissioner, private corporation or association." Under the agreement, amongst the participants in the System, Basin Electric, a private corporation, is the project manager during construction of the generation station and transmission lines and after construction will be operating agent of the station and related distribution facilities. Construction and operation of such a plant are not governmental functions but the performance of ministerial duties.

A similar arrangement has been approved in *Roehl v. Public Utility District No. 1 of Chelan County*, 1953, 43 Wash.2d 214, 261 P.2d 92, under a like constitutional provision. The hiring of technical personnel to construct· and operate a plant involves no delegation of the discretionary power associated with governmental decisions, but the work of building and maintaining the plant involves only duties of an administrative nature. Here, as previously explained, the management committee, upon which the Agency is represented, makes decisions of a policy nature. In the case before us, all such members of the management committee have an equal voice, regardless of the size of the interests they represent. The mayors and councils of the municipalities joined together and their representatives on the joint board of the Agency are certainly not qualified nor capable of personally, and with their own hands, building and operating a power plant. Engineering competence must be left to others.

■ As long as the municipality and its representatives retain their powers of judgment, discretion and management, there is no objection to an alliance with private enterprise, with the latter performing ministerial and executive functions requiring special skills. *Bowley v. City of Omaha*, 1967, 181 Neb. 515, 149 N.W.2d 417. The municipalities in their discretion considered it good business judgment to do so. As long as control is left in the hands of the regularly-designated representatives of the public, passing on the details of carrying out a municipal function, there is not an unconstitutional delegation. *Fristam v. City of Sheridan*, 1949, 66 Wyo. 143, 206 P.2d 741.

2. Does the participation by the Agency with the System Agreement require the Agency to lend credit to, or own capital stock in a private corporation or association, in violation of § 6, Article XVI, Wyoming Constitution, providing:

"Neither the state nor any county, city, township, town, school district, or any other political sub-division, shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation. The state shall not engage in any work of internal improvement unless authorized by a two-thirds vote of the people."

The mayor asserts that § 20 of the participation agreement conflicts with the quoted constitutional prohibition. That section of the contract states, in brief, that if any party to the agreement with the System defaults, the remaining parties must make up any deficiencies in funds resulting from failure of any other party to make its payments, when due. That, asserts the mayor, constitutes lending or giving of the credit of the Agency to a private corporation and the Agency should have no more powers than the municipalities that created it. The mayor further argues that in acquiring an interest in a private corporation, it is violating that provision of the constitutional section in question prohibiting a city from becoming the owner "of the capital stock of any association or corporation."

■ While the section of the agreement in question does provide for making up deficiencies created by a defaulting participant, it also provides that a pro rata share of the portion in System entitlements, owned by the defaulter, shall accrue to the benefit of the other participants. This neutralizes any concept of giving or lending

credit to anyone since something is received in return. The constitutional prohibition against a municipality lending its credit to a private corporation has no application when there is an exchange of consideration between the parties. *Cremer v. Peoria Housing Authority,* 1948, 399 Ill. 579, 78 N.E.2d 276. This is only a contract to pay for electric service, which it will receive in exchange. *Bair v. Layton City Corporation,* 1957, 6 Utah 2d 138, 307 P.2d 895. When something belonging to a municipality is not given away to the contracting private corporation without receiving something in exchange, there is no lending of credit. *Los Angeles Gas & Electric Corporation v. City of Los Angeles,* 1922, 188 Cal. 307, 205 P. 125.

Examples of lending credit are found in the background of the constitutional prohibition under consideration. When the United States was expanding to the West in the 19th Century, an adjacent railroad was important, even vital to local economic growth. As a consequence, states and municipal governments offered financial assistance to railroads, taking the form of stock or security purchases or cosigning on bonds issued by railroads. Many of those ventures failed, leaving governmental units and so the taxpayer holding worthless investments or liable for inadequately-secured debts. During the depression, nine states defaulted or repudiated debts of that type. The crisis created led to strong restrictions against government involvement in private ventures. Forty-five state constitutions prohibit the lending of credit.[7] The purpose was to prevent private speculation with public funds.

██ No such a transaction is involved here. There exists no such a guarantee with a chance of loss as surety or guarantor of the debt of another. The Agency would acquire a greater interest in the System and have additional electricity available for

sale. The Agency is not buying stock in a private corporation for investment purposes, as in the case of the private investor buying stock for its dividends or for speculation. The Agency is buying an electric-generating system, along with others, for the purpose of electric supply for its customers, the citizens of the respective communities participating.

██ The constitutional limitation on municipalities lending money or credit to a private entity does not prohibit a joint ownership by municipal corporations and private power companies of an electric-generating plant. *Public Utility District No. 1 v. Taxpayers and Ratepayers of Snohomish County,* 1971, 78 Wash.2d 724, 479 P.2d 61; *Miles v. City of Eugene,* 1969, 252 Or. 528, 451 P.2d 59. See also *Whelan v. N. J. Power & Light Company,* 1965, 45 N.J. 237, 212 A.2d 136, wherein Jersey City entered into an agreement with a private corporation for the purpose of supplying the city with a water supply system and the corporation with an hydroelectric power plant. The courts we cite visualize such partnerships as a practical, sensible solution to supply local energy and other utility needs, as do we. Private enterprise should have no monopoly on business-like practices.

██ 3. Does the Joint Powers Act contain an unconstitutional incorporation by reference of statutory provisions taken from other existing legislation?

Section 26, Article III, Wyoming Constitution, provides:

"No law shall be revised or amended, or the provisions thereof extended by reference to its title only, but so much thereof as is revised, amended, or extended, shall be re-enacted and published at length."

The Act authorizes the issuance of bonds in order to finance the carrying out of any joint project undertaken under its provi-

---

7. "State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise—A Suggested Analysis," 41 Univ. of Colo. Law Rev., p. 135. For further historical background, see 56 Am.Jur.2d Municipal Corporations, § 599, and Heins, "Constitutional Restrictions Against State Debt," University of Wisconsin Press, 1963, pp. 3–12.

sions. Section 9–18.18(a)(ii) and (iii).[8] It should be noted that the procedure for issuance of revenue bonds is not integral to the Act but other statutory provisions are borrowed by reference as follows: " * * * Such securities shall meet the requirements and provisions of sections 35–136.2 through 35–136.5 of the statutes as provided for the issuance of bonds by hospital districts." The Act does not restrict the percentage of interest that may be paid, whereas hospital district bonds are held to "not more than ten per centum (10%) per annum."

This court has already held that the constitutional prohibition does not apply to the type incorporation by reference here questioned. It was said in *Board of County Commissioners of the County of Albany v. White*, 1959, 79 Wyo. 420, 335 P.2d 433:

" * * * [T]his limitation does not apply to statutes which refer to existing laws merely for the purpose of pointing out procedure in executing powers which the statute itself, original in form by its own language, grants, and enforcing rights or discharging duties created or imposed by such statutes. * * * "

This method of using a reference to include procedural matters is in common use to cut down bulk in statute volumes by unnecessary repetition.[9] We hold use of the reference technique, as here applied, is not constitutionally objectionable but makes good sense.

4. Does the power contract and the issuance of revenue bonds constitute the creation of a municipal debt, subject to § 4, Article XVI, Wyoming Constitution, and subject to its limitations?

Section 4, Article XVI, provides:

"No debt in excess of the taxes for the current year shall, in any manner, be created by any county or sub-division thereof, or any city, town or village, or any sub-division thereof in the State of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people thereof and by them approved."

The contract between the several municipalities, authorizing the Agency to acquire electrical energy, and providing, in turn, for its sale to the municipalities, including Cody, is by its terms to remain in effect until the 1st day of February of the year 2016—40 years. The mayor asserts that because of its term, beyond one year, it falls within the constitutional prohibition and should be approved by vote of the people.

The power contract specifically provides that payments due for electricity

---

8. Section 9–18.18 provides in pertinent part as follows:

"(a) Any joint project undertaken pursuant to this act [§§ 9–18.13 to 9–18.20] may be financed:

* * * * * *

"(ii) By bond issues by one (1) or more participating agencies to construct, improve or acquire an interest in any facility in the same manner as bonds may be issued by the agency for its individual construction, improvement or acquisition of such a facility;

"(iii) By revenue bonds issued by a joint powers board to be repaid solely from revenues provided by this section or any revenue received by a joint powers board from the lease or operation of property controlled by a board. Revenue securities may be issued upon majority approval of the members of a joint powers board and may be executed and delivered at any time, in such form and denominations, in such amounts, negotiable or not, payable in such manner and at such place, redeemed or repurchased prior to maturity with or without premium, and may

bear such interest as provided by resolution of a joint powers board authorizing the issue. Such securities shall meet the requirements and provisions of sections 35–136.2 through 35–136.5 of the statutes as provided for the issuance of bonds by hospital districts.

* * * * * *"

9. The evil at which § 26, Article III, is directed is explained in *State v. Pitet*, 1952, 69 Wyo. 478, 243 P.2d 177:

" * * * Its purpose was intended to prevent ill-advised and fraudulent legislation. Perhaps to prevent that which was done by a Roman Emperor who published a law, but it was written in a very small hand and posted up in a corner so no one could make a copy of it. In other words, the constitutional restriction was aimed at the mischief of embracing in the same bill before a legislative body incongruous matters having no relation to each other, or to the subject specified in the title, by which laws were often adopted without attracting attention. * * * "

sold to each municipality is payable only from revenues derived from the retail sale of electricity to the customers of the municipal distribution system. The contract for power requires Cody "to maintain rates for electric power and energy furnished to its utility customers which will provide to [Cody] revenues sufficient to meet its obligations under the contract." This contractual arrangement is something like that arising between the purchasers of revenue bonds and a municipality. This court has consistently held that there is no debt against the municipality created within the purview of the constitutional limitation when the amounts due are payable solely from a special fund, not fed by taxes where prohibited, created from service charges only collected from users; service charges are not a tax. *Snyder v. City of Cheyenne*, 1959, 79 Wyo. 405, 334 P.2d 750; *Laverents v. City of Cheyenne*, 1950, 67 Wyo. 187, 217 P.2d 877. Since payment of the service charges made for the electricity does not in any way involve the taxing power of the municipality, there is no constitutional violation.

It appears to be a universal rule that an agreement to pay a fixed rate for an important service, such as water, electricity, gas or other municipal necessaries, over a period of years, upon an as-needed basis, with periodic payment, creates no debt in the sense of the constitutional requirement. *Hall v. City of Baltimore*, 1969, 252 Md. 416, 250 A.2d 233 (long-term lease of warehouse); *Hillard v. City of Mobile*, 1950, 253 Ala. 676, 47 So.2d 162 (water supply); *Struble v. Nelson*, 1944, 217 Minn. 610, 15 N.W.2d 101 (fixed fire hydrant rental for city use); *Simpson v. City of Highwood*, 1939, 372 Ill. 212, 23 N.E.2d 62, 124 A.L.R. 1459 (fire hydrant rental); *Wyatt v. Beall*, 1938, 175 Md. 258, 1 A.2d 619 (state agreed to pay from year-to-year maintenance of a bridge to be paid for by tolls); *Plant Food Co. v. City of Charlotte*, 1938, 214 N.C. 518, 199 S.E. 712 (10-year contract for removal of sludge from city's sewage treatment plant).

Other than in nomenclature, there is very little difference between the power contract between the City of Cody and the Agency and the contract that will be entered into between the Agency and the revenue bond holders. In both cases, the city and the Agency are merely pledging the revenues of municipally-owned electric facilities to pay for electric-generating facilities. It is the prevailing view, not only in Wyoming but elsewhere, that no debt is created within the constitutional-limiting provision when the obligation is payable from the income of self-sustaining public utilities. 15 McQuillin, Municipal Corporations, § 41.-34, p. 373, et seq.; 56 Am.Jur.2d, Municipal Corporations, §§ 651, 652 and 653. The words "other funds legally available," in *the contract phrase as a source to make up any differences*, indicates that a prohibited use of tax or other protected money, to make up differences, would not be available. We hold the power contract and issuance of revenue bonds constitutional.

5. Outside the constitutional issues, the mayor asserts there is not sufficient legal authorization for the proposed activities of the Agency.

The appellant's assertion lacks any definiteness, as does his argument. He seems to be saying, however, that there is nothing in the Joint Powers Act which specifically says that municipalities, in the business of selling and distributing electrical power and energy to their residents, can enter in the type transaction in which they are involved here. He relies on *City of Buffalo v. Joslyn*, Wyo.1974, 527 P.2d 1106, where the following general statement was made:

"* * * [W]e note the universal rule that municipalities can exercise only those powers of government which are expressly or impliedly conferred. * * *" 527 P.2d at 1107.

However, the word "impliedly," used in *City of Buffalo*, is reinforced by the Joint Powers Act itself, § 2, Chapter 21, Session Laws Wyoming, 1974:

"*Section 2.* This act is intended to permit local governmental units to make the most efficient use of their powers enabling them to cooperate with each other on a basis of mutual advantage and to there-

by provide services and facilities in a manner and pursuant to forms of governmental organization which will accord best with geographic, economic, population and other factors influencing the needs and development of local communities. To this end this act is to be liberally construed." [10]

Furthermore, there is another provision of the act, which we consider pertinent. Section 9–18.15(c) allows cities to "jointly plan, create, expand, finance and operate: * * (xi) Electrical systems owned by municipalities prior to March 1, 1975."

We seldom find legislative intent so clearly expressed. One of our responsibilities in statutory construction is to ascertain legislative intent and give it effect, if that is possible. *Wyoming State Treasurer v. City of Casper*, Wyo.1976, 551 P.2d 687; *Lohman v. Jefferson Standard Life Insurance Company*, Wyo.1974, 525 P.2d 1; *Hoffmeister v. McIntosh*, Wyo.1971, 361 P.2d 678, reh. den. Wyo., 364 P.2d 823. We additionally observed in *Wyoming State Treasurer v. City of Casper*, supra, that we must view a statute in light of the purposes and objects to be accomplished.

We have earlier noted in this opinion that when a municipality is engaged in an activity in its proprietary capacity, it must be treated much as a private enterprise and the latter should have no monopoly on good business practices. We view the act as an expression of legislative intention that municipal electrical utilities should participate in the economies of a large-capacity plant and mingle and join with others through ownership of an interest in common. We cannot, in the light of legislative intention, stand in the way of depriving the interest of communities in assuring a supply of electric energy to meet future needs, in the face of the Bureau of Reclamation having reached its limit as a source of supply. The legislature has clearly pointed up that it

intended to extend liberally to municipal electric utilities the same benefits and efficiency available to other utilities, through combined ownership of a generating system. It would be an impossible and impracticable demand for us to insist on the legislature providing every little detail on how to go about carrying out an authority bestowed. In the absence of some good reason to do so, we should not apply a construction which would nullify, destroy or defeat the intention of the legislature. *State ex rel. Kirk v. Gail*, Wyo.1962, 373 P.2d 955.

The recent amendment of the Wyoming Constitution, adding § 1, Article XIII,[11] allowing for "home rule" also lends some insight into the fashion in which we should examine this case. It is there, in pertinent part, prescribed:

"(b) All cities and towns are hereby empowered to determine their local affairs and government as established by ordinance passed by the governing body, subject to referendum when prescribed by the legislature, and further subject only to statutes uniformly applicable to all cities and towns, and to statutes prescribing limits of indebtedness. * * *

* * * * * *

"(d) The powers and authority granted to cities and towns, pursuant to this section, shall be liberally construed for the purpose of giving the largest measure of self-government to cities and towns."

There is no prohibition in the Wyoming Constitution which would preclude the legislature from permitting political subdivisions of the State of Wyoming from joining together, as allowed by the Joint Powers Act. Subject to constitutional restraints, the legislature may create bodies corporate to carry out such powers as it deems necessary. *War Memorial Hospital of District No. 1, Park County v. Board of County Commissioners of Park County*, 1955, 73

---

10. We note that this section was not incorporated as a separate section by the compiler of W.S.1957, 1975 Cum.Supp., but only referred to in the footnote to § 9–18.20.

11. This section was amended by a resolution adopted by the 1971 legislature, ratified by a vote of the people at the general election held November 7, 1972, and proclaimed in effect December 12, 1972.

Wyo. 371, 279 P.2d 472. We find no constitutional prohibition preventing joint activities by municipalities of the state.

■■■ 6. Will the Laramie River project be used by the Agency for purposes other than those permitted by the Act?

The point made by the appealing mayor in this assignment of error arises out of § 9–18.19(a) of the Act providing "No participating agency nor any legal entity created pursuant to this Act [§§ 9–18.13 to 9–18.20] shall construct, operate or maintain any facility or improvement other than for service to and use by the participating agencies or their residents." It is the mayor's contention that total power generated at the Laramie River project is to be sold to others than the Agency and the participating municipalities and that surplus power, to which the communities are entitled and for which there is no immediate need, will be sold to others.

Such a view is unreasonably restrictive. Statutes are to be construed in a reasonable manner. *In re Romer*, 436 P.2d 956. A statute which has in view an object of great public utility, is entitled to an interpretation which will carry out the legislative purpose. *Woolley v. State Highway Commission*, Wyo.1963, 387 P.2d 667. The legislature intended a liberal, not a stingy interpretation. The Agency's participation in the generation project is only 1%; the remaining production of power will not be taking place at the expense of the Agency or the expense of the communities served by the Agency. It is the sizeable number of participants in the System that makes it feasible.

Section 9–18.19(a) does not, by its terms, prevent the sale of any surplus power. It must be realized that the project is being built for the purpose of serving not only current but future needs of the Agency members. The participants considered it wise that the generation plant be constructed to serve anticipated needs for some years ahead. In the meantime, sale of surplus will result in greater economy and lower rates, as long as available. It was further considered reasonable that surplus power,

at the moment, is only an incident of the operation. There is no indication in the record that the sale of surplus is a primary purpose or intent of the Agency. The participants considered it sound business judgment to build for the future. We have no reason before us to disagree with those considerations.

We are satisfied the legislature knew when it passed the Joint Powers Act, authorizing joint operation of electrical systems, there would be a period during which surplus power would be available. If it did not realize it at the time, it later became aware that such would become the case. The Joint Powers Act was passed in 1974, Ch. 21, Session Laws Wyoming 1974. In 1976, the following amendment to § 37–1(f) was made, defining public utility for regulation and rate-fixing purposes:

"* * * if any municipal utility owns an undivided interest in a facility for the production of electricity which is also partly owned by an agency subject to the jurisdiction of the public service commission, the sale of electricity in excess of the participating municipalities' need is subject to this act; * * *." (Section 37–1, W.S.1957, 1976 Interim Supp.)

Clearly, the legislature contemplates sale of surplus electricity by agencies, such as here.

7. Is the fixed-rate formula, agreed upon in the power contract, in some way impermissible as to Cody?

The rate formula agreed upon between the municipalities is one designed to provide the Agency with sufficient revenue to meet its revenue requirements, substantially as follows: (1) the cost of operation and maintenance of facilities owned or operated by the Board, (2) the cost of administration and overhead, (3) the cost of electric power and energy purchased for resale, (4) the cost of renewals and replacements of facilities, (5) payments of principal and interest on all bonds and notes of the Board, (6) the establishment and maintenance of reserves as may be required by the terms of the bonds or note resolution, (7) additional amounts which must be realized by the

Board in order to meet the requirements of any rate covenants with respect to coverage of debt service on bonds or notes under the terms of any bond or note resolution or other contract with holders of such bonds or notes, plus such additional amounts deemed desirable to facilitate marketing bonds and notes of the Board on favorable terms.[12] The rate is required to be from time to time adjusted, but at least annually.

The mayor asserts that this is not the way a municipality does business, is not in conformance to statutes and ordinances requiring open and competitive bidding and that the agreement is unfair since its rate formula guarantees the Agency a fixed level of income irrespective of how well or how poorly it is operated and thus any incentive to efficient management is lacking. The mayor further claims that there is no specific statutory direction, authorizing the city to engage in such a contract, and legislative intent, extending such authority, is lacking.

█ It is apparent that Cody and the other municipalities, party to the contract, must get their electrical energy from some source. Where there are no limitations or restrictions as to a mode of contracting provided by the legislature to carry out a power plainly and expressly bestowed upon a municipality, the appropriate method is left to the discretion of municipal authorities with the usual test of the validity being whether the contract is reasonable. This court so spoke with approval in *Whipps v. Town of Greybull*, 1941, 56 Wyo. 355, 109 P.2d 805, 146 A.L.R. 596.

There is no question about the authority of a city to purchase electricity. Section 15.1–428, W.S.1957, in effect, since enacted by § 4, Ch. 59, Session Laws, Wyoming, 1921, provides: "Any city or town may purchase electric current from outside its corporate limits upon such terms and conditions agreed upon by the parties." This implements the express powers granted cities and towns to establish light plants and transmission lines to bring electricity from the place obtained, granted by § 15.1–410(e) and (f), W.S.1957. Section 15.1–3(5) grants power to the governing bodies of towns "To make all contracts and do all other acts in relation to the property and concerns of the city necessary to the exercise of its corporate powers." In the absence of any further direction, the rule of reasonableness must apply.

The only state statute, pertaining to advertising for bids and appearing in those statutes applicable to cities and towns, is § 15.1–13, W.S.1957, 1975 Cum.Supp.; it provides, in pertinent part:

12. The verbatim language of revenue requirements of the contract, § 2a, is as follows:

"(i) The cost of operation and maintenance of facilities owned or operated by Seller for the generation or transmission of electric power and energy provided under the Power Contracts;

"(ii) the cost of administration, general overhead and power supply planning associated with meeting Seller's obligations under the Power Contracts;

"(iii) the cost of any electric power and energy purchased for resale by Seller under the Power Contracts and the cost of transmission service for delivery of electric power and energy provided under the Power Contracts to the points of delivery;

"(iv) payments of principal and interest on all bonds and notes of Seller issued in connection with its obligations under the Power Contracts and payments which Seller is required to make into any debt service reserve fund or account under the terms of any bond or note resolution or other contract with holders of such bonds or notes;

"(v) the cost of renewals and replacements of facilities owned or operated by Seller for the generation or transmission of electric power and energy provided under the Power Contract;

"(vi) the establishment and maintenance of additional reserves as may be required by the terms of any bond or note resolution or other contract with holders of such bonds or notes with respect to the foregoing subsections (i) through (v); and

"(vii) additional amounts, if any, which must be realized by Seller in order to meet the requirements of any rate covenant with respect to coverage of debt service on such bonds or notes under the terms of any bond or note resolution or other contract with holders of such bonds or notes plus such additional amounts deemed desirable to facilitate marketing bonds and notes of Seller on favorable terms."

"All contracts for purchases of property or for any public improvement, contracts relating to the municipal water supply, contracts for the lighting of streets, public buildings and public places, and any other public work or improvement excepting contracts for engineering services required to complete such improvements for any city or town when the cost exceeds $1,500 shall be advertised for bid. * * *"

That is a general statute and seems to have no clear language related to the type transaction before us. It could not be applicable, even assuming the City of Cody, by itself, were to buy into the Laramie River Electric Generating and Transmission System, as a tenant in common.[13] A statute will not be construed to reach an absurd result. *In re Romer*, supra. It would be absurd or at least unreasonable to call for bids to buy into an electric generating and transmission system, as a tenant in common, in order to assure a future supply of electricity! We find that principle particularly applicable when there is a special statute authorizing the city to buy "electric current * * * upon such terms and conditions agreed upon by the parties." If in order to buy electricity, it would be necessary, as a condition to acquire an interest as a tenant in common, we would see no objection, where the only liability is to pay for the energy acquired, as here. We, of course, confine ourselves to the type transaction here being considered and none other. When we read all statutes on the same subject together as one statute, which we must, *In re Adoption of Female Child X*, Wyo.1975, 537 P.2d 719, we then apply the well-known rule that special provisions must prevail over general provisions, *Town of Worland v. Odell & Johnson*, 1958, 79 Wyo. 1, 329 P.2d 797.

 We see nothing unreasonable or unfair about the contract. It does not require the City of Cody to take more power than it needs. The evidence is uncontradicted that there is a need for future power because the Bureau of Reclamation has reached its capacity to supply electrical energy beyond its present commitments. Cody contends it will be in a position to program its long-range electrical needs and avoid catch-as-catch-can procurement on the open market, if there is any such thing in the business of acquiring energy of this type. There is no showing in the record of other dependable electricity fountainheads.

The mayor has given us no cogent or authoritative reasons why the contract with the Agency will be unfair to the city. It is buying electricity essentially at cost and Cody can sell at its own established rate. If it appears that the Agency is operating inefficiently and wastefully or contrary to the terms of the contract, its terms of agreement specifically state " * * * nothing contained herein shall be construed to prevent or restrict the Participant from asserting any rights which it may have against Seller under this Contract or under any provision of law, including the institution of legal proceedings for specific performance or recovery of damages." The rate is constantly under review and will not be fixed without the knowledge of any municipality because each is represented on the joint board. Provision is made for assignment, access to the premises of the Agency and the right to examine records. The agreement between municipalities, bringing the Agency into being, it is contended, provides a sound organizational structure, providing for election of officers, their duties, outlining powers, hiring employees, financial control and other terms associated with good business organization; we have been presented and see no reason to disagree.

 8. Is it necessary that an election be held and there be elector-approval before issuance of revenue bonds by the Agency? Section 9–18.18 provides that joint projects may be financed:

"(a) * * * (iii) By revenue bonds issued by a joint powers board to be repaid

---

**13.** A joint powers board can only exercise a power, privilege or authority held by its participants. Section 9–18.15.

solely from revenues provided by this section or any revenue received by a joint powers board from the lease or operation of property controlled by a board. *Revenue securities may be issued upon majority approval of the members of a joint powers board and may be executed and delivered at any time, in such form and denominations, in such amounts, negotiable or not, payable in such manner and at such place, redeemed or repurchased prior to maturity with or without premium, and may bear such interest as provided by resolution of a joint powers board authorizing the issue.* Such securities shall meet the requirements and provisions of sections 35–136.2 through 35–136.5 of the statutes as provided for the issuance of bonds by hospital districts." (Emphasis added.)

There is no suggestion within the language of the Act that an election of any sort be held. The clear language indicates that a majority of the Agency's joint powers board has been given the exclusive authority by a majority decision to issue the bonds at any time. There is no election required by any provision of Article XVI, Wyoming Constitution, because there is no debt within the purview of the Constitution.

It is settled in this state, even though there is no constitutional requirement for an election, that it could be mandated by the legislature because it can fix more stringent conditions on the exercise of a power. *Whipps v. Town of Greybull*, supra. The mayor thus argues that the Wyoming Political Subdivision Bond Election Law, §§ 22.1–285 through 22.1–296, W.S.1957, 1975 Cum.Supp., requires an election, with approval of the electorate, before the bond issuance.

The Political Subdivision Bond Election Law is only applicable *when* an election is "*required by law.*" Section 22.1–285.[14] It appears to be a commendable effort by the legislature in 1973 to make uniform the

procedures to be followed when an election is *required* prior to issuance of bonds of any sort. We find no language requiring an election approval in all instances when revenue bonds are to be issued.

It should be observed that the securities to be issued by a joint powers board shall meet the requirement of those issued by hospital districts. Sections 35–136.2 through 35–136.5. Those sections do not require an election prior to issuance of *revenue* bonds, § 35–136.1, payable solely from special fund revenues derived from and realized after payment of costs of operation and maintenance of facilities, § 35–136.3, and the hospital trustees have "plenary powers" with respect to their resolution to issue revenue bonds, § 35–136.10, W.S.1957, 1975 Cum.Supp. "Plenary" means, according to Webster, "ABSOLUTE", "PERFECT", "UNQUALIFIED". It is a different story, however, when general obligation bonds are to be issued by the trustees of a hospital district; there must be an election by submitting the question to the electors for prior approval. Section 35–129, W.S. 1957, 1975 Cum.Supp. In arriving at the intention of the legislature, in enacting a statute, this court must take into consideration the context of a statute, other sections or acts in pari materia and, by application of the usual and well-known rules of construction of words or terms employed. *People ex rel. School District No. 3 in Laramie County v. Dolan*, 1894, 5 Wyo. 245, 39 P. 752.

The language of all the cited pertinent statutes is so clear that it needs no construction. Where statutory language is plain, unambiguous and conveys a clear meaning, there is no occasion for resorting to rules of statutory construction and we have no right to impose some meaning to the contrary. *Geraud v. Schrader*, Wyo. 1975, 531 P.2d 872, cert. den. *Wind River Indian Education Association v. Ward*, 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134. We therefore hold that no election is necessary

14. Section 22.1–285 is as follows:
"This chapter including sections 22.1–285 through 22.1–296 of the statutes, shall be known as the 'Political Subdivision Bond

Election Law,' and each election required by law to authorize the issuance of bonds shall be conducted under the provisions hereof."

before issuance of the revenue bonds of the Agency and there is no illegality for non-compliance with the Political Subdivision Bond Election Law.

We affirm the district court in all respects.